No. 14871

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

THE STATE OF MONTANA,

                    Plaintiff and Respondent,

        vs.

DIONISIO WILLIAMS,

                    Defendant and Appellant.

Appeal from:  District Court of the Thirteenth Judicial District,
              Honorable C. B. Sande, Judge presiding.

Counsel of Record:

    For Appellant:

        Michael J. Whalen argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        John Maynard argued, Assistant Attorney General, Helena,
         Montana
        Harold F. Hanser, County Attorney, Billings, Montana
        Robert Waller argued, Deputy County Attorney, Billings,
         Montana

                        Submitted:  December 10, 1979

                        Decided:

Filed:

_____
                            Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant Dionisio (Danny) Williams was found guilty of two counts of conspiracy by a jury in Yellowstone County District Court. The Honorable C. B. Sande entered judgment of conviction and sentenced Williams to five years on Count I and 10 years on Count II, the sentences to be served consecutively. Williams appeals.

Defendant and the State present drastically different versions of the facts. The State's theory is that Williams masterminded a burglary and a theft in Billings, Montana.

The burglary occurred first. The State asserts that on November 10, 1978, Williams drove Mark Alberta and Jack Suiter to a Billings residence and directed them to break in and steal drugs. Alberta and Suiter entered the house but found no drugs. They went back to the car and Williams directed them along with another juvenile, to return to the house and steal a stereo. They returned with the stereo, a pistol and some clothes. Police recovered the stereo from defendant's stepmother's house. The gun was recovered from Denise Barker, with whom Williams had left it.

The robbery of the gas station occurred on November 15, 1978. Alberta and Suiter, together with Mark Best and Williams, were at Williams' apartment where the State contends they planned the robbery. About 2:00 a.m. Best and Williams left the apartment and drove to the gas station. Best told one of the attendants the station would be robbed shortly and warned him not to resist. He also said if the attendants cooperated they would be rewarded with a small amount of marijuana. Best informed the other attendant of this by phone.

Upon returning to the apartment, Williams gave Alberta and Suiter stockings to use as masks, a gun, rope from under the

sink and his car keys. Alberta and Suiter committed the crime and returned to defendant's apartment and distributed the money. The rope they used to tie the attendants up was found by the police and the gun was found in a compartment a few feet from Williams' apartment.

When Alberta was first questioned by the police, he did not implicate Williams in either crime. He later changed his story and the facts to which he testified are substantially those summarized above.

Williams denies any agreement to or participation in the crimes. He asserts he was "holding" the stereo equipment found at his stepmother's house while he raised money to buy it from Alberta and Suiter. He also contends that his car was used by Alberta and Suiter but that he had no knowledge they were going to commit a robbery. He testified he went to the gas station with Best but that he did not know about the robbery nor did he have any conversation about it. Best appeared as a rebuttal witness and testified that he and Williams planned the gas station robbery together.

The issues on appeal, as framed by the State, are:

1. Did the District Court's denial of the defendant's motion for change of venue or a continuance deprive him of due process?

2. Did the District Court err in denying defendant's challenge for cause of juror Leona Whetham?

3. Was the testimony of defendant's accomplices adequately corroborated?

4. Did the District Court err in allowing the rebuttal testimony of Mark Best?

5. Did the District Court err in denying defendant's motion for a mistrial?

- 3 -

6. Did the District Court properly instruct the jury?

Defendant first argues that certain articles appearing in the Billings Gazette were "inflammatory" and "invidious" parts of a campaign staged against him by local law enforcement personnel and the media.

On the basis of this publicity, defendant filed a motion for a change of venue under section 46-13-203, MCA. The premise of such motion was that prejudice against defendant in the county in which he was charged was such that he could not receive a fair trial in that county. Such matters are "addressed to the sound discretion of the trial court, and unless there has been shown a clear abuse of discretion, its ruling will not be disturbed." See also State v. Hoffman (1933), 94 Mont. 573, 580, 23 P.2d 972; State v. Lewis (1976), 169 Mont. 290, 295, 546 P.2d 518.

In conjunction with the motion for a change of place of trial, defendant alternatively sought a continuance. The thrust of his argument in this regard is that during the continuance the alleged fervor created by the publicity would have died down. This Court has stated:

> "Motions for continuance are addressed to the discretion of the trial court and the granting of a continuance has never been a matter of right. (Citation omitted.) The district court cannot be overturned on appeal in absence of a showing of prejudice to the movant. (Citation omitted.)
>
> "Defendant's argument therefore must stand or fall on the issue of prejudice, for the district court can be said to have abused its discretion only if its ruling was prejudicial. We have not found a single case . . . in which the denial of a motion for continuance was reversed without a showing of resulting prejudice to the movant." State v. Paulson (1975), 167 Mont. 310, 315, 538 P.2d 339.

The motions for a change in venue and a continuance were denied. Defendant argues he was thereby denied his right to a fair trial "by a panel of impartial 'indifferent' jurors." Irvin

- 4 -

v. Dowd (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 1642,

6 L Ed 2d 751, 755. We disagree.

> "Indicia of this denial of fair trial, resulting from prejudicial publicity, as gleaned from our law, seems to be: Arousing feelings of the community, threat to personal safety of defendant, established opinion of members of the community as to the guilt of the accused, news articles beyond the objectivity of news printing and dissemination, State v. Dryman, 127 Mont. 579, 269 P.2d 796, and difficulty or failure in securing a fair, impartial jury from the community in which the news articles appeared, State v. Davis, supra, 60 Mont. 426, 199 P. 421; State v. Bess, 60 Mont. 558, 199 P. 426.

> "Our court looks for a chain reaction. It starts with the basic premise that the accused is entitled to a fair trial. Next it checks the publicity complained of, as to its contents and more important, as to its total effect upon the 'fair trial right.' Further, it looks at effects in the form of the discriminating marks we have discussed. Finally, it objectively considers the end result-- was a fair trial denied as a result of the publicity and its effects? If its findings are negative it refuses to find abuse of discretion on the part of the trial judge." State v. Board (1959), 135 Mont. 139, 143-144, 337 P.2d 924.

Defendant's assertion that prejudice flowed from the article is unsupported by affidavit or otherwise. An affidavit must accompany a motion for a change of venue, section 46-13-203, MCA, and for this reason alone, that motion could have been properly denied. However, our decision rests on the fact that, even if the community was aroused by the publicity or if there was an opinion regarding defendant's guilt within the community, the facts do not indicate he was denied a fair trial. Of the twelve jurors and one alternate selected, nine could not recall having heard or read anything about the case and three remembered only defendant's unusual name or that the gas station had been robbed. One juror was not asked any questions at all. There was no abuse of discretion in denying the motions.

In connection with this matter, we feel compelled to issue a warning to prosecuting attorneys and law enforcement officers concerning statements to the news media prior to trial. A

criminal defendant is guaranteed the right to a trial by an impartial jury in a court of law. U.S. Const., Amend. VI; 1972 Mont.Const., Art. II, §17. Extrajudicial statements by prosecutors and law enforcement personnel prejudicial to defendant and which are disseminated in the news media prior to trial may under some circumstances destroy the impartiality of prospective jurors. Certain extrajudicial statements that were made in this case following defendant's release on his own recognizance prior to trial appeared in the Billings Gazette on March 9, 1979:

> "Several Billings police officers, who said they did not know Williams was out of jail until the beating incident, expressed dismay that 13th District Judge C. B. Sande approved his release.
>
> " . . .
>
> "One Billings detective who has helped track Williams down twice in the last three months, said, 'Why are we doing this again? He'll probably only be let out again.'
>
> "A deputy county attorney said of Williams' release, 'I think it's a mistake, a big mistake.'"

The making of statements like the ones in this case indicates a disregard for principles embodied in our system of law. In the long run, such statements are harmful to law enforcement and potentially damaging to the right of an accused to a trial before an impartial jury. In this case, the publication of the comment did not contaminate the jurors because they remembered so little about the pretrial publicity in the case. However, under other circumstances and in a different context, these or similar comments might deny an accused his right to a fair trial before an impartial jury or require the place of trial to be changed at considerable expense and delay.

Defendant next argues that the presence of Leona Whetham on the jury deprived him of his right to trial by a fair and impartial jury. Her prejudice, according to defendant, was revealed on voir dire:

- 6 -

"Q. [By defense counsel Whalen.] Mrs. Whetham, do you and your husband subscribe to the Billings Gazette?

"MRS. WHETHAM: Yes.

"Q. Do you read it on a regular basis?

"MRS. WHETHAM: Yes.

"Q. Has anyone talked to you about the case at all before today?

"MRS. WHETHAM: No.

"Q. Have you mentioned it or discussed it with anyone else, your husband or any outsider?

"MRS. WHETHAM: Not that I remember of, no.

"Q. Do you recall having read about it in the paper?

"MRS. WHETHAM: I remember that gas station was robbed, and that is all I remember.

"Q. But you don't recall any specific articles in connection with this defendant, is that correct?

"MRS. WHETHAM: That is right.

"Q. Do you know of any reason why you could not be fair and impartial if you were selected as a trial juror in this case?

"MRS. WHETHAM: No.

"Q. If, during the course of this case, you should develop a feeling that this defendant may have done things which you would not approve of, but still at the same time if you have a doubt as to whether or not he is guilty of a particular offense with which he is charged, what would you do during the course of your deliberations?

"MRS. WHETHAM: Pardon me, would you . . .

"Q. I say, if at the conclusion of this case that there are some things that came to your attention about this defendant's conduct which you dislike, and let's say you disliked it intensely, but yet at the same time you had a reasonable doubt in your mind during your deliberations as to whether or not he is guilty of a particular offense with which he is charged here, what would you do?

"MRS. WHETHAM: Well, seeing as how it is not his personal actions and stuff, that you are charging him for, well, what would you do is the evidence that he is on trial for, if there is a doubt that he had done it, I would acquit him.

"Q. If you hated him, but you had a reasonable doubt as to whether or not he was guilty of the offense with which he is charged, would you acquit him?

"MRS. WHETHAM: I believe so, yes.

"Q. Do you have any doubt about it?

"MRS. WHETHAM: Well, I suppose if it came down to really personal feelings about him, you might have that waive how you vote, I imagine, if it was real strong.

"Q. I don't want to talk unreasonably with you, but I think that the substance of the instructions upon the law would be that you have to find he is guilty of the particular offense with which he is charged, beyond a reasonable doubt, and I don't want to be unfair, but on the other hand, I don't want the defendant convicted if he [sic] should have a doubt about his guilt of the particular offense, but just did not like him, I don't know if you are following my distinction or not.

"MRS. WHETHAM: Yes.

"Q. With that in mind, do you feel you could be fair and impartial, if you were selected as a trial juror in this cause?

"MRS. WHETHAM: Well, no I don't think so then.

"Q. You don't think you could?

"MRS. WHETHAM, No.

"MR. WHALEN: Your Honor, I respectfully challenge the juror for cause for implied bias.

"COURT: Mr. Waller?

"Q. [by Deputy County Attorney Waller] Mrs. Whetham, I really don't understand why you feel you would not be able to be fair and impartial.

"MRS. WHETHAM: Well, if I suppose that would, if he had done something you try to be fair, you know, but whether you get into the personal like he was saying, some things that did not really believe that he should have done, it would probably put you (inaudible), I imagine.

"Q. Well, you would decide whether he was guilty or innocent, based upon the evidence, wouldn't you?

"MRS. WHETHAM: Try to anyway.

"Q. Correct, and you would try to not let your personal feelings intrude in that, wouldn't you?

"MRS. WHETHAM: (inaudible.)

- 8 -

"Q. If you hated him, but you had a reasonable doubt as to whether or not he was guilty of the offense with which he is charged, would you acquit him?

"MRS. WHETHAM: I believe so, yes.

"Q. Do you have any doubt about it?

"MRS. WHETHAM: Well, I suppose if it came down to really personal feelings about him, you might have that waive how you vote, I imagine, if it was real strong.

"Q. I don't want to talk unreasonably with you, but I think that the substance of the instructions upon the law would be that you have to find he is guilty of the particular offense with which he is charged, beyond a reasonable doubt, and I don't want to be unfair, but on the other hand, I don't want the defendant convicted if he [sic] should have a doubt about his guilt of the particular offense, but just did not like him, I don't know if you are following my distinction or not.

"MRS. WHETHAM: Yes.

"Q. With that in mind, do you feel you could be fair and impartial, if you were selected as a trial juror in this cause?

"MRS. WHETHAM: Well, no I don't think so then.

"Q. You don't think you could?

"MRS. WHETHAM, No.

"MR. WHALEN: Your Honor, I respectfully challenge the juror for cause for implied bias.

"COURT: Mr. Waller?

"Q. [by Deputy County Attorney Waller] Mrs. Whetham, I really don't understand why you feel you would not be able to be fair and impartial.

"MRS. WHETHAM: Well, if I suppose that would, if he had done something you try to be fair, you know, but whether you get into the personal like he was saying, some things that did not really believe that he should have done, it would probably put you (inaudible), I imagine.

"Q. Well, you would decide whether he was guilty or innocent, based upon the evidence, wouldn't you?

"MRS. WHETHAM: Try to anyway.

"Q. Correct, and you would try to not let your personal feelings intrude in that, wouldn't you?

"MRS. WHETHAM: (inaudible.)

"Q. Do you feel you are going to have any problems doing that?

"MRS. WHETHAM: I would try not to, but I couldn't . . .

"Q. You don't have any reason to hate or dislike the defendant at this time, do you?

"MRS. WHETHAM: Not at all, no.

"Q. You are aware of the fact that when the time comes, you could make your decision and would have to make it based upon the evidence?

"MRS. WHETHAM: Yes.

"Q. Are you prepared to do that?

"MRS. WHETHAM: I would try to, yes.

"MR. WALLER, I resist the challenge, Your Honor.

"COURT: Deny the challenge, proceed."

Our standard of review has been succinctly stated:

"The examination of a juror on his voir dire is no more nor less than the taking of testimony on the issues raised as to his qualifications to serve in the case before the Court. (Citations omitted.) The determination must be left largely to the sound discretion of the trial court (Citations omitted.) and, in determining the question, the trial court, as in passing upon any other question of fact established by oral testimony, has the advantage of observing the witness on the stand, his demeanor and candor, or lack of candor, and a review of the court's rulings and findings should be governed by the same rules as in reviewing any other findings and judgment based thereon. They should not be set aside unless error is manifest, or there is shown a clear abuse of discretion . . ." State v. Russell (1925), 73 Mont. 240, 235 P. 712.

There was no abuse of discretion in this case. The existence of some confusion in the record is all the more reason to rely on the trial court's decision.

"True, there are cases holding that when a witness has once admitted bias his subsequent statements that he can consider the evidence impartially should be viewed with caution. But granting the need for careful scrutiny of the testimony of a witness who has first said 'no' and then said 'yes', it still remains the province of the trial court to decide where the truth lies and with that determination the appellate court will not interfere unless a clear abuse of discretion is shown." State v. Allison (1948), 122 Mont. 120, 130, 199 P.2d 279, 286.

Defendant's next contention is that the evidence does not support his conviction because the testimony of his accomplices was insufficiently corroborated. The most recent explanation of the law on this point is found in State v. Kemp (1979), ____Mont.____, 597 P.2d 96, 98-99, 36 St.Rep. 1215, 1217-1218:

" . . . section 46-16-213, MCA, provides:

"'<u>Testimony of person legally accountable</u>. A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense, as defined in [45-2-301, MCA], unless the testimony is corroborated by other evidence which in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.'

"The sufficiency of evidence necessary to corroborate accomplice testimony is a question of law. State v. Standley (1978), ____Mont.____, 586 P.2d 1075, 1078, 35 St.Rep. 1631, 1635; State v. Perry (1973), 161 Mont. 155, 161, 505 P.2d 113, 117. In defining the quantum and character of proof required to corroborate accomplice testimony, a substantial body of caselaw has evolved.

"To be sufficient, corroborating evidence must show more than that a crime was in fact committed or the circumstances of its commission. State v. Keckonen (1938), 107 Mont. 253, 263, 84 P.2d 341, 345. It must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. State v. Gangner (1947), 130 Mont. 533, 535, 305 P.2d 228, 229. But corroborative evidence need not be sufficient, by itself, to support a defendant's conviction or even to make out a prima facie case against him. State v. Ritz (1922), 65 Mont. 180, 186, 211 P. 298, 300; State v. Stevenson (1902), 26 Mont. 332, 334, 67 P. 1001, 1002. Corroborating evidence may be circumstantial (State v. Harmon (1959), 135 Mont. 227, 233, 340 P.2d 128, 131) and can come from the defendant or his witnesses. State v. Phillips (1953), 127 Mont. 381, 387, 264 P.2d 1009, 1012.

"With these principles in mind, each case must be examined on its particular facts to determine if the evidence tends, in and of itself, to prove defendant's connection with the crime charged.

"One accomplice cannot supply the independent evidence necessary to corroborate another accomplice. State v. Bolton (1922), 65 Mont. 74, 88, 212 P. 504, 509; 30 Am Jur 2d Evidence, Sec. 1156 . . ."

The key words in the statute are that the corroborating

evidence must "tend to connect" defendant with the offense. " . . . [T]here should be some fact deposed to, independently of the evidence of the accomplice, which taken by itself leads to the inference, not only that a crime has been committed, but that the prisoner is implicated in it."  State v. Keckonen, 107 Mont. at 260, citing State v. Lawson (1912), 44 Mont. 488, 120 P. 808.

There is no doubt the crimes were committed.  The corroborating evidence clearly tends to connect defendant with the commission of the crimes.  As to the burglary:  Defendant, although he was storing it at his stepmother's, had constructive possession of the property stolen.  The pistol taken in the burglary was identified by its owner as the gun given by Williams to Denise Barker.  Defendant admitted leaving the gun with Denise Barker.  In addition, defendant knew the burglary victim and had been to his house and had seen the stereo.

As to the theft:  Williams admitted being with Best, Alberta and Suiter immediately before the robbery and for much of the preceding evening.  He admitted going to the gas station with Best before the robbery and having loaned his car to Alberta and Suiter during the time they committed the crime.  The police found rope similar to that used in the robbery under Williams' kitchen sink.  An FBI expert testified that this "robbery rope" and the "sink rope" were very similar.  The ropes were compared on the basis of color, twist, and ply.  Additionally, both ropes came from an exercise device.  Both had "disks" which appeared to have been chewed on by a dog and when the ropes were viewed together they made a complete exercise device.  The expert testified it was "extremely remote" that the "robbery rope" and the "sink rope" came from different pieces of rope.

The foregoing independent evidence tends to implicate Williams in the crimes and when coupled with the accomplice testimony, supports his convictions.  See State v. Dess (1969), 154 Mont. 231,

- 11 -

462 P.2d 186.

Defendant next argues that coconspirator Mark Best's testimony should not have been allowed. He contends that Best, appearing as a rebuttal witness testified to the elements of the crime. According to defendant, this was not properly rebuttal evidence but should have been introduced during the State's case-in-chief and Best should have been included in the list of potential witnesses in the information.

Section 46-15-301(1), MCA, provides:

"For the purpose of notice only and to prevent surprise, the prosecution shall furnish to the defendant and file with the clerk of the court at the time of arraignment a list of the witnesses the prosecution intends to call. The prosecution may, any time after arraignment, add to the list the names of any additional witnesses upon a showing of good cause. The list shall include the names and addresses of the witnesses. This subsection does not apply to rebuttal witnesses." (Emphasis supplied.)

Rebuttal testimony is that which tends to disprove or contradict evidence presented by the adverse party. State v. Cates (1934), 97 Mont. 173, 200, 33 P.2d 578. The question here comes down to whether Best was rebutting or giving new evidence.

Defendant was his own sole witness. He testified he knew nothing of the planned robbery of the Conoco station and did not ask Best to contact his friends who worked there. On rebuttal, Best testified that Williams was aware of the robbery and had asked him to telephone the station. Best's testimony tended to disprove defendant's testimony and was proper rebuttal.

Defendant next asserts a mistrial should have been declared upon his testimony on cross-examination that he lived with and was supported by a female who was a prostitute. He contends this is inadmissible evidence of another crime. Section 45-5-602(1)(h), MCA, makes it illegal to live off the wages of a prostitute. He concludes the evidence is inadmissible under

- 12 -

Rule 404(b), M.R.Evid., which provides:

> "Evidence of other crimes, wrongs, or acts
> is not admissible to prove the character of a
> person in order to show that he acted in conform-
> ity therewith. It may, however, be admissible
> for other purposes, such as proof of motive, oppor-
> tunity, intent, preparation, plan, knowledge, iden-
> tity, or absence of mistake or accident."

The evidence was not introduced to show that defendant acted in conformity with his character in committing the crimes charged. It was elicited from his own mouth in the course of cross-examination to show the implausibility of his contention that he hoped to buy the stolen stereo for $1,000. The fact that defendant had no independent income and was living off the wages of a prostitute was relevant to his financial status.

We recognize the rule that even though relevant and other-wise admissible, evidence may be excluded if its prejudicial effect substantially outweighs its probative value. Rule 403, M.R.Evid.; State v. Rollins (1967), 149 Mont. 481, 484, 428 P.2d 462. The trial judge made this determination and admitted the testimony. We find no abuse of discretion. There is nothing in the record to indicate that the jury was informed that living off the wages of a prostitute is a crime and it is difficult to imagine how such evidence could lead to conviction of conspiracy to commit burglary and theft.

Defendant's final specification of error is that several jury instructions were improper. The first instruction to which he objects reads, in pertinent part:

> "A voluntary act includes an omission to perform a
> duty which the law imposes on the offender and which
> he is capable of performing.
>
> "The word 'act' means a thing done or that which is
> done. It includes any bodily movement, any form
> of communication, and where relevant, a failure or
> omission to take action." Instruction No. 3.

Defendant argues that in order to commit the crime of conspiracy, an overt act is necessary. Conversely, he argues that the elements

- 13 -

of the crime cannot be met by proof of an omission.

The jury was instructed in the words of the statute:

"A person commits the offense of conspiracy when, with the purpose that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement has been committed by him or by a coconspirator." Section 45-4-102(1), MCA. (Emphasis added.)

Also by statutory definition:

"'Act' has its usual and ordinary meaning and includes any bodily movement, any form of communication, and where relevant, a failure or omission to take action." Section 45-2-201(1), MCA. (Emphasis added.)

We reject the argument that conspiracy may never be proved by demonstrating an omission to act in furtherance of the conspiracy. See e.g. Gerson v. United States (8th Cir. 1928), 25 F.2d 49, conspiracy to fail to list assets in bankruptcy.

The theory upon which this case was tried by the State was that defendant or another coconspirator had done overt acts in furtherance of the crime. As the jury was instructed that the definition of "act" included omission only "where relevant" we are unable to find any error in the instruction.

Instruction No. 3 continues:

"Purpose or knowledge are manifested by the circumstances connected with the offense and need not be proved by the direct evidence but may be inferred from acts, conduct and circumstances appearing in evidence." (Emphasis added.)

Defendant's objection is that this portion of the instruction unconstitutionally shifts the burden of proof from the state to defendant on the element of intent and thus violate the principles set forth in Sandstrom v. State of Montana (1979), ____U.S.____, ____S.Ct.____, 61 L Ed 2d 39. We disagree. The basis of the United States Supreme Court in its Sandstrom decision was that the jurors "were not told that they had a choice or that they might infer that conclusion; they were told only that the law presumed

- 14 -

it."    _____U.S. at_____,   _____S.Ct. at_____, 61 L Ed 2d at 45.

(Emphasis added.)   Regarding the inference, as distinguished from the presumption of intent, the United States Supreme Court has said:

> "Since intent must be inferred from conduct of some sort, we think it is permissible to draw usual reasonable inferences as to intent from overt acts."  Cramer v. United States (1945), 325 U.S. 1, 31, 65 S.Ct. 918, 933, 89 L.Ed. 1441, 1459.

The Court's instruction No. 5 is as follows:

> "You are instructed that the doubt which a juror is allowed to retain in his mind and under the influence of which he should form a verdict of not guilty, must always be a reasonable one.
>
> "A reasonable doubt is not such a doubt as a man may start by questioning for the sake of a doubt, nor a doubt suggested or surmised without foundation in the facts or testimony.  It is such a doubt as in a fair, reasonable effort to reach a conclusion upon the evidence, using the mind in the same manner as in other matters of the highest and gravest importance, prevents the jury from coming to a conclusion in which their minds rest satisfied.
>
> "If, in so using the mind and considering all the evidence produced, it leads to a conclusion which satisfies the judgment and leaves upon the mind a settled conviction of the truth of the fact, it is the duty of the jury to declare the fact by their verdict.
>
> "It is possible always to question any conclusion derived from testimony, but such questioning is not what is a reasonable doubt.  A reasonable doubt exists in that state of the case which, after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction to a moral certainty of the truth of the charge.
>
> "A doubt produced by undue sensibility in the mind of any juror, in view of the consequences of his verdict, is not a reasonable one, and a juror is not allowed to create sources or materials of doubt by resorting to trivial and fanciful suppositions and remote conjectures as to a possible state of facts differing from that established by the evidence."

Instruction No. 6 provides:

> "The law does not require demonstration--that is, such a degree of proof as, excluding possibility of error, produces absolute certainty, because such proof is rarely possible.

- 15 -

"Moral certainty only is required, or that degree of proof which produces conviction beyond a reasonable doubt in an unprejudiced mind."

Defendant contends that Instruction No. 6 is repetition of Instruction No. 5 and unduly emphasizes the cautionary aspects of reasonable doubt. We disagree. Instruction No. 5 defines and explains reasonable doubt while Instruction No. 6 defines the degree of proof necessary to convict. Both are proper instructions.

Defendant also assigns error to Instruction No. 9:

"A person commits the offense of conspiracy who, with the purpose that the offense of theft be committed, agrees with others to the commission of the offense of theft, and an act in furtherance of the agreement is performed by any party to the agreement.

"Each party to a conspiracy is responsible for all acts performed by his co-conspirators in furtherance of the conspiracy.

"To constitute the offense of conspiracy it is not necessary that the conspirators succeed in committing the offense of theft."

We reject defendant's argument that the instruction is in the abstract and does not apply to the facts and law of the case. The instruction is proper in this case.

This statement of the law is entirely correct. The final objection is to Instructions No. 10 and 11, which read:

"A person commits the offense of Burglary if he knowingly and unlawfully enters or remains in an occupied structure with the purpose to commit an offense therein." No. 10.

"A person commits the offense of Theft when he purposely or knowingly obtains or exerts unauthorized control over property of the owner and has the purpose of depriving the owner of the property. The offense of Theft is a felony where the value of the property taken exceeds $150.00." No. 11.

The crime of conspiracy contemplates an agreement to commit an act punishable by law, here burglary and theft. It is not error to instruct the jury as to the crimes underlying the charges of conspiracy.

Affirmed.

Frank J. Braswell
_____
Chief Justice

- 16 -

We concur:

_____

_____ John Conway Harrison

_____

_____ John C. Sheehy
Justices