No. 14836

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

STATE OF MONTANA,

        Plaintiff and Respondent,

  vs.

TIMOTHY WOGAMON,

        Defendant and Appellant.

Appeal from: District Court of the Fourteenth Judicial District,
                Honorable Nat Allen, Judge presiding.

Counsel of Record:

    For Appellant:

        D. Frank Kampfe, Red Lodge, Montana
        Frank O'Loughlin argued, Red Lodge, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Chris Tweeten argued, Assistant Attorney General,
         Helena, Montana
        Mark Racicot argued, Assistant Attorney General,
         Helena, Montana
        John L. Pratt, County Attorney, Roundup, Montana

                Submitted: February 19, 1980

                 Decided: APR 30 1980

Filed: APR 30 1980

_Thomas J. Kearney_
                       Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Timothy Wogamon appeals from a conviction on the charge of criminal sale of dangerous drugs in violation of section 45-9-101, MCA. The conviction was entered in the District Court, Fourteenth Judicial District, Musselshell County.

On October 27, 1977, at 7:00 p.m., Musselshell County Sheriff Brian Neidhardt received a telephone call from Betty Holiday, postmaster in Musselshell, Montana. Holiday wanted Neidhardt to investigate the suspicious activity of a group claiming to be a data research organization. The group had recently moved into a boarded-up house across the street from the Musselshell post office.

At about 9:00 a.m. the next morning, Friday, October 28, Neidhardt and Deputy Sheriff Floyd Fisher went to Musselshell to investigate the group's activity. Upon reaching Musselshell they located the house and knocked on the door. A man, later identified as Donald Wogamon, answered the door. Neidhardt introduced himself. Mr. Wogamon acknowledged the introduction and allowed the officers to enter the house.

Neidhardt explained the nature of the sheriff's visit to Mr. Wogamon. Mr. Wogamon said the group worked for Union Carbide and was researching the stability of a solvent. Neidhardt could see laboratory equipment in the kitchen.

Neidhardt asked if he could look around. Mr. Wogamon did not respond. Neidhardt briefly looked into the kitchen. Not suspecting any illegal activity, Neidhardt returned to the front door. On his way to the front door, he saw a young man in the hallway. The young man, later identified as the defendant, was acting nervously.

-2-

Mr. Wogamon suggested the two sheriffs accompany him across the street to the hotel to talk. On the way over, Mr. Wogamon introduced himself as "Bill Gibbs". At the hotel, he handed Neidhardt a business card with that name and a California telephone number on it. As Neidhardt wrote the information down, Mr. Wogamon said he had federal funds for the solvent project and had located in Musselshell for a "tax write-off." Neidhardt gave the card back. After a brief talk, Neidhardt and Fisher walked back to their car and drove back to Roundup.

When the sheriffs reached Roundup at 10:33 a.m., Holiday was again talking on the telephone with the sheriff's office. While Mr. Wogamon was talking with the sheriffs, the defendant ran through the alley looking over his shoulder as he ran. He ran to the hills. Later, the defendant sneaked back to the house and peeked around the corner at the sheriff. Now, the two men were frantically loading boxes into a van and a car.

Neidhardt called the Drug Enforcement Administration (DEA) and talked to agent Don Friend. They discussed what Neidhardt had observed in Musselshell and whether it could be a drug laboratory. Neidhardt also told Friend about meeting "Bill Gibbs." Friend described "Bill Gibbs" to Neidhardt. The description did not match the man Neidhardt knew as Bill Gibbs. Neidhardt was told to return to Musselshell since the operation could be a drug laboratory.

Neidhardt, Fisher and Deputy Sheriffs Bill Perry and George Raczek returned to Musselshell. Upon reaching Musselshell, Neidhardt parked his car on the east side of the house. Mr. Wogamon came around the corner of the house as Neidhardt exited from his car. Neidhardt asked why the vehicles were being loaded up so fast. Mr. Wogamon explained the laboratory was being moved to the hotel. This seemed suspicious to Neidhardt.

-3-

Mr. Wogamon had earlier said he did not intend to move the laboratory. Neidhardt next asked why the windows were boarded up. He was told it was to keep offensive odors inside so the neighbors would not be upset. Neidhardt thought this was strange since no neighbors were in the area.

Mr. Wogamon then invited Neidhardt inside the house to look around. Once inside, Neidhardt asked if he could write down the names of the chemicals. Mr. Wogamon consented, and Neidhardt walked through the house writing the names down.

When they were outside again, Neidhardt asked Mr. Wogamon to come to Roundup so Neidhardt "could check things out." Mr. Wogamon agreed and went to lock up the buildings. While Mr. Wogamon was gone, Neidhardt saw the defendant and asked him his name. He answered, "Timothy Gibbs." When Mr. Wogamon returned, Neidhardt asked Mr. Wogamon to ride with Neidhardt and the defendant to ride with Perry. Mr. Wogamon agreed, but the defendant did not answer.

Upon leaving Musselshell, neither Wogamon was handcuffed, but Perry did give the defendant a "pat-down" search. Neidhardt radioed a "10-15" to the Musselshell sheriff's office. This code technically means "prisoner in custody," but the Musselshell sheriff's office also uses it to mean another person present. Neidhardt also asked the sheriff's office to call and have County Attorney John Pratt present when the group arrived in Roundup.

Upon arriving in Roundup at 11:45 a.m., Mr. Wogamon and the defendant were taken to the visitor's section of the jail. Mr. Wogamon asked permission to call his attorney. While the call was being made, Neidhardt went to the jail's backroom to call the DEA. During this time no one told the Wogamons where they should stay while they were in the sheriff's office. Jerry Jones, an FBI agent, was in the backroom. Jones told

-4-

Neidhardt "Bill Gibbs" was really Donald Wogamon. Neidhardt then called the DEA and gave agent Friend the list of chemicals.

County Attorney Pratt showed up while Neidhardt was in the backroom. After his telephone call, Neidhardt told Pratt what had transpired. They discussed charging the Wogamons with unsworn falsification to authorities, a misdemeanor. Section 45-7-203, MCA.

At about 11:55 a.m., agent Friend called back. He told Neidhardt the list of chemicals contained all the necessary ingredients for making methamphetamine except one, phenyl-2-propanone. Neidhardt immediately sent Perry back to Musselshell to secure the house. Neidhardt did not attempt to verify Friend's information. After talking with Neidhardt, Pratt concluded there was enough information for a search warrant.

At about 12:12 p.m., Mr. Wogamon and the defendant were "booked" for unsworn falsification to authorities. A short time later, a complaint charging Mr. Wogamon with that crime was drawn up. It was discovered the defendant could not be charged with this crime. It requires a written instrument, and the defendant had merely lied to the sheriffs. Section 45-7-203, MCA. After lunch, the complaint was presented to Justice of the Peace Amanda Scott and signed in her presence. An arrest warrant for Mr. Wogamon was issued, and bond was set at $300.

About this same time, a search warrant for the Musselshell property was issued by the District Court. The warrant covered a three block area in Musselshell including 27 lots. It covered all five buildings in the three block area, a van and a 1971 Chevrolet. The search warrant authorized a search for dangerous drugs. Neither the name "Timothy Wogamon" or "Timothy Gibbs" appeared on the search warrant or the application therefore.

-5-

Neidhardt took the complaint and the arrest warrant to the sheriff's office. However, upon reaching the office, he discovered the search warrant for the Musselshell property was ready. Neidhardt gave the arrest warrant to some officers, told them to serve it on Mr. Wogamon and told them to release the defendant. Then, Neidhardt took Mr. Wogamon's keys to unlock the Musselshell buildings, and left immediately with Pratt for Musselshell.

While the defendant was being released from jail at about 3:30 p.m., Neidhardt called the sheriff's office and ordered that the defendant be arrested again on a charge of criminal sale of dangerous drugs. Raczek informed the defendant of the new charge and booked him for that crime.

The search of the Musselshell property covered a three day period. In addition, Mr. Wogamon's wallet was searched on at least two different occasions. All together, some 200 items were seized.

On Monday, October 31, 1977, the defendant was arraigned at 1:30 p.m. The defendant was served with an arrest warrant for the first time immediately before the arraignment.

Prior to trial, the defendant moved to suppress all evidence seized from the Musselshell property and from Mr. Wogamon's wallet. The District Court denied the motion on the grounds that the defendant lacked standing to challenge the search and the motions were substantively without merit.

The defendant's trial began on October 31, 1978. Upon his conviction, the defendant was sentenced to serve 15 years in the state penitentiary with 13 years suspended.

Seven issues have been raised for review. They may be summarized as follows:

(1) Whether court's instruction no. 1, items 6 and 7, are unconstitutional under Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39.

(2) Whether it was error to deny the defendant's motions to suppress the evidence based upon an illegal arrest, an illegal detainer and lack of probable cause to issue a search warrant.

(3) Whether it was error to deny motions to dismiss the charge against the defendant for denial of a speedy trial and for lack of probable cause to file an information.

(4) Whether it was error to allow the State to call an alibi rebuttal witness without first giving notice to the defendant prior to trial.

We have carefully examined all the issues raised by the defendant. The only issue with substantive merit is the challenge to court's instruction no. 1, item 7. We agree with the defendant that court's instruction no. 1, item 7, is reversible error.

Sandstrom v. Montana, supra, has resulted in a spate of appeals to this Court claiming instructional error. We have since determined the applicability of the Sandstrom decision in the original conviction of Sandstrom himself, State v. Sandstrom (1979), ____ Mont. ____, 603 P.2d 244, 36 St.Rep. 2099; and in State v. Sunday (1980), ____ Mont. ____, ____ P.2d ____, 37 St.Rep. 561; State v. Fitzpatrick (1980), ___ Mont. ____, 606 P.2d 1343, 37 St.Rep. 194; State v. Hamilton (1980), ____ Mont. ____, 605 P.2d 1121, 37 St.Rep. 70; State v. Bad Horse (1980), ___ Mont. ____, 605 P.2d 1113, 37 St.Rep. 45; State v. Hardy (1980), ____ Mont. ____, 604 P.2d 792, 37 St.Rep. 1; State v. Williams (1979), ___ Mont. ___, 604 P.2d 1224, 36 St.Rep. 2328; and State v. Coleman (1979), ___ Mont. ____, 605 P.2d 1000, 36 St.Rep. 2237.

Until today, only in State v. Sandstrom, supra, have we found a reason under the United States Supreme Court Sandstrom decision to reverse the state court conviction and remand the

-7-

same for retrial.  In the other cases, we have distinguished Sandstrom v. Montana, supra, as not controlling.  However, we cannot do that here with respect to court's instruction no. 1, item 7.

> "Court's instruction no. 1, items 6 and 7 read as follows:
>
> "6.  Purpose or knowledge is manifested by the circumstances connected with the offense. Purpose or knowledge need not be proved by direct evidence, but may be inferred from acts, conduct and circumstances appearing in evidence.
>
> "7.  The law presumes that a person intends the ordinary consequences of his voluntary acts."

Court's instruction no. 1, item 6, is a permissive inference.  It allows, but does not require, the jury to infer ultimate facts from basic facts adduced by the State. No burden of proof is placed upon the defendant.  Ulster County Court v. Allen (1979), 442 U.S. 140, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777, 792; State v. Coleman, supra.

Since a permissive inference is involved, the defendant must show the invalidity of the inference as applied to him. He must show there is no rational way under the facts of this cause for the jury to make the connection permitted by the inference.  Otherwise, there is no risk the presumptively rational jury will use the inference to make an erroneous factual determination.  Ulster County Court v. Allen, supra. The defendant has not carried his burden of proof upon appeal.

We cannot say the same for court's instruction no. 1, item 7, however.  This instruction is reversible error under Sandstrom v. Montana, supra.

The State contends Sandstrom is distinguishable from this cause.  Sandstrom involved a deliberate homicide which requires proof of a purposeful or knowing voluntary act which causes a particular result, the death of a human being.  Under these circumstances, the instruction directs the jury to find intent

-8-

if it finds a voluntary act and the ordinary consequence of that act was the victim's death. According to the State, the defendant here, however, was only charged with intending to commit a voluntary act, purposely, knowingly and unlawfully manufacturing a dangerous drug. In the State's view, the jury need only have found the defendant intended to engage in a voluntary act to impose criminal liability; the jury need not have found any ordinary consequence. Thus, according to the State, Sandstrom v. Montana, supra, is not implicated, and the instruction was superfluous.

The State's contention is inviting but misleading. To sustain the charge against the defendant, the State needed to prove beyond a reasonable doubt that the defendant purposely or knowingly manufactured a dangerous drug, as defined in section 50-32-101, MCA. Section 45-9-101, MCA. The voluntary act here is manufacturing. The ordinary consequence is a dangerous drug. Under this framework, court's instruction no. 1, item 7, directed the jury to presume intent, purposely or knowingly, upon proof by the State of a voluntary act, manufacturing, and that act's ordinary consequence, a dangerous drug.

As a result, the instruction conflicts with Sandstrom v. Montana, supra. Given the lack of qualifying instructions, a reasonable jury may have interpreted the instruction in either of two impermissible ways. First, the jury may have interpreted the instruction as a conclusive presumption. If so, the State would be relieved from proving a necessary element of the crime charged, intent. This would violate In Re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. Second, the jury may have interpreted the instruction as shifting the burden of proving lack of intent to the defendant upon proof by the State of the defendant's voluntary act and its ordinary consequence. If so, this would violate Mullaney v. Wilbur (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508.

-9-

In order for federal constitutional error to be harmless, we must declare a belief that the error was harmless beyond a reasonable doubt. Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. We must determine the impact of the erroneous instruction upon a reasonable jury, and to constitute harmless error, we must be able to agree as a Court that the offensive instruction could not reasonably have contributed to the jury's verdict. State v. Sandstrom, supra, 603 P.2d at 245, 36 St.Rep. at 2100.

We cannot do that here. The evidence of intent here is not overwhelming. With regard to this issue, the State's case against the defendant was based entirely upon circumstantial evidence.

Therefore, the cause is reversed and remanded to the District Court for retrial consistent with this opinion and the guidelines established by Sandstrom.

_John C. Shelby_
Justice

We Concur:

_Frank I. Haswell_
Chief Justice

_John Conway Harrison_

_Daniel J. Shea_
Justices