FILED

11/18/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0620

DA 23-0620

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 264

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JOSEPH DWAYNE MATT,

      Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Broadwater, Cause No. BDC-2023-05
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

        James Park Taylor, Attorney at Law, Missoula, Montana

      For Appellee:

        Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

        Kevin Bratcher, Broadwater County Attorney, Townsend, Montana

Submitted on Briefs:  September 10, 2025

Decided:  November 18, 2025

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1    Joseph Dwayne Matt appeals his conviction of Criminal Possession of Dangerous Drugs in the Montana First Judicial District Court, Broadwater County. Matt asserts that the District Court erred in denying his motion to suppress evidence discovered during an unlawful search of Levi Gadaire's vehicle. Specifically, Matt argues that despite his status as a probationer and passenger of the vehicle at the time of the search, he has standing to challenge the illegal search and the evidence it produced, which he argues should be suppressed under the exclusionary rule. Additionally, Matt asserts that the District Court erred in denying his motion to direct a verdict at the close of the State's case due to the State's failure to corroborate accomplice testimony by sufficient independent evidence, as required under § 46-16-213, MCA.

¶2    We state the dispositive issue on appeal as follows:

*Did the District Court err in denying Matt's motion for a directed verdict based on insufficient corroborating evidence?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    On the afternoon of January 31, 2023, Matt was riding along as a passenger in the front seat of Gadaire's vehicle when Gadaire was pulled over for erratic driving by Sergeant Buck of the Broadwater County Sheriff's Office. Both Matt and Gadaire were on probation at the time, and their probations were conditioned upon having no known association with other probationers and parolees. Additionally, Matt was flagged as an absconder and the Interstate Compact Office had an active warrant for his arrest.

2

¶4 Matt and Gadaire cooperated with Buck during the traffic stop, providing him with their names and the fact that they were both on probation. Buck quickly discovered the warrant for Matt's arrest, and Matt was handcuffed and placed in the back of a patrol vehicle. Buck also contacted Gadaire's parole officer, Officer Lamb, and informed him of the traffic stop, Gadaire's erratic driving, and Gadaire's association with Matt, an absconder. Buck also informed Lamb that "the story's not lining up," although he did not provide Lamb with any details as to why he thought something was off. Buck asked Lamb whether he wanted to authorize a search of Gadaire's vehicle, and Lamb declined to do so at that time.

¶5 Almost immediately after Buck's call with Lamb, Buck stated to Gadaire, "at the end of the day, you know you're going to let me search your car." Then—without any *Miranda* warnings—Buck asked Gadaire if he had been drinking or using drugs. Gadaire answered, informing Buck that he used meth earlier in the morning. Buck then relayed Gadaire's admission to Lamb during their second phone call, at which point Lamb authorized a search of the vehicle.

¶6 Buck searched the vehicle and in its center console discovered two 30-gram bags of methamphetamine, a plastic container holding 11.4 grams of methamphetamine, a digital scale, and several small plastic bags. Gadaire was charged with Criminal Possession of a Dangerous Drug with Intent to Distribute and Criminal Possession of Drug Paraphernalia. Matt was charged with Criminal Possession of a Dangerous Drug with Intent to Distribute by Accountability, as well as Criminal Possession of Drug Paraphernalia.

¶7     Matt's jury trial commenced on July 17, 2023.  The jury heard testimony from Andrea Flores, the driver who initially reported Gadaire's erratic driving to the Broadwater County Sheriff's Office, as well as Buck who described the traffic stop, the subsequent arrests, and the search of the vehicle.  The jury also reviewed a clip from Buck's body cam showing Buck's initial interaction with Gadaire and Matt, in which Buck asked Gadaire for his license and Gadaire can be seen rummaging around in the center console.  The jury also saw footage of Buck searching the vehicle and discovering the drugs and drug paraphernalia in the center console of the vehicle.

¶8     The jury then heard testimony from Gadaire in which he provided an account different from that of his prior statements.[1]  Gadaire testified that on the morning of the traffic stop he had been in Butte dropping off his girlfriend when he got in touch with Matt, who he knew lived in Butte.  Gadaire informed the jury that he was looking for someone to "ride with him" to Three Forks, Montana, where he had plans to pick up methamphetamine from "Matt and Ashley," two drug dealers from Belgrade, Montana.  Gadaire explained that he was looking for company because he was concerned about being robbed.  However, Gadaire admitted that when he called Matt looking for help, he told him the job would be moving heavy items at his mom's house in Boulder, Montana, in exchange for "some product—or cash and some product," which, according to Gadaire, Matt agreed to.  Gadaire testified that once they were driving over Homestake Pass on I-90, he told Matt

---

[1] Subsequent to trial, Gadaire wrote a letter to the prosecuting attorney recanting his testimony implicating Matt had any involvement with the drugs or drug deal which led to Matt filing a motion for a new trial.  As the case was on appeal, nothing has occurred with regard to this motion.

4

about his plans to pick-up in Three Forks and Matt agreed to still accompany him and told Gadaire, "I'll make sure you're okay."

¶9 Gadaire went on to testify that when he and Matt arrived in Three Forks, they went inside the Lucky Lil's Casino adjacent to the Town Pump gas station where they then gambled as they waited for "Matt and Ashley" to arrive. Gadaire provided that once he heard from "Matt and Ashley," he and Matt drove across the parking lot to park next to their vehicle. Gadaire stated that he then got in "Matt and Ashley's" vehicle, where he weighed out two one-ounce bags of methamphetamine. Gadaire provided that he then returned to his vehicle with the two bags of meth and put them both in the center console. When asked if Matt saw him put the drugs in the center console, Gadaire responded that he would assume so, and confirmed that Matt was in the passenger seat and awake at the time. Gadaire then stated that after the pick-up, he and Matt got gas, picked up a cinnamon roll from Wheat Montana, then started the drive to his mother's house in Boulder, admittedly via an indirect route, before they were stopped in Townsend.

¶10 On cross-examination, Gadaire admitted that his story had changed several times throughout the course of the investigation. Gadaire acknowledged what he calls his "lying testimony," in which he told detectives that he was picking Matt up in Three Forks and that he (Gadaire) didn't know about the two ounces of drugs. In his second version of events, Gadaire said that Matt agreed to pay him with drugs if Gadaire picked him up in Three Forks. Then, after law enforcement informed Gadaire that they would pull fingerprint evidence from the bags of methamphetamine, Gadaire changed his story yet again, admitting the drugs were his but telling the detectives that he picked them up in the Town

5

Pump bathroom. In his fourth version of events, Gadaire told detectives that he picked up the drugs from "Matt and Ashley" in the Town Pump parking lot, but that one of the ounces had been for Matt. Finally, in his testimony at trial, Gadaire admitted that "[he] never intended to give [Matt] an ounce at all." Gadaire also admitted that the container with 11.4 grams of methamphetamine found in the center console belonged to his girlfriend and had been in the vehicle prior to the pick-up at Town Pump.

¶11 The jury also heard testimony from Matthew Reighard, a deputy sheriff with the Lewis and Clark County Sheriff's Office and sergeant of operations for the Missouri River Drug Task Force's Helena office. Reighard reviewed surveillance footage obtained from the Three Forks Town Pump showing Matt getting into Gadaire's front passenger seat prior to Gadaire driving over and parking next to "Matt and Ashley's" vehicle. Gadaire can then be seen getting into "Matt and Ashley's" vehicle for several minutes while Matt appears to remain in Gadaire's vehicle. Once Gadaire returns to his own vehicle, he and Matt drive over to the gas pumps, where they both exit the vehicle to fill up and Matt goes inside the store front. Additional footage from about five minutes earlier was also reviewed, in which Gadaire can be seen driving over to "Matt and Ashley's" vehicle by himself while Matt remains in the casino. Though Gadaire parks briefly next to "Matt and Ashley's" vehicle, he appears to remain in his own vehicle and no interaction between them can be seen.

¶12 Reighard also testified about the interviews he conducted with Gadaire and Matt, which took place the day after their arrests. Reighard emphasized that while Matt was adamant that he did not know anything about the drugs and that his fingerprints would not be found on any of the evidence seized, Matt admitted that he was expecting Gadaire to

6

pay him cash for helping move stuff in Boulder, and that once he got back to Butte, he might turn that payment "into a quarter gram or something."

¶13 The jury also reviewed text and call data extracted from Gadaire's phone. The data included several calls between Gadaire's phone and "Matt and Ashley (Belgrade)" over the days leading up to the traffic stop. The data also included text messages between Gadaire and other contacts referencing fentanyl and other drugs.

¶14 At the close of the State's case, Matt made a motion for a directed verdict on the basis that the State's evidence was insufficient to support a conviction because it relied on the uncorroborated statements of an accomplice. Though the District Court acknowledged the State had a "weak case" and "the [S]tate's kind of hanging on by a thread," the court ultimately denied the motion. The charges were sent to the jury after Matt testified in his own defense, in which he denied having any involvement with the drugs and drug paraphernalia found in the center console.

¶15 The jury found Matt not guilty of Criminal Possession of Drug Paraphernalia. However, the jury found Matt guilty of Criminal Possession of a Dangerous Drug, the lesser offense of Criminal Possession of a Dangerous Drug with Intent to Distribute by Accountability. Matt appeals.

**STANDARD OF REVIEW**

¶16 "We review the denial of a motion for directed verdict in the same manner that we review the sufficiency of evidence to support a conviction." *State v. Byers*, 2003 MT 83, ¶ 6, 315 Mont. 89, 67 P.3d 880. That is, we review the sufficiency of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could

7

have found the essential elements of the crime beyond a reasonable doubt. *Byers*, ¶ 6. "The decision to direct a verdict at the close of the State's case lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *Byers*, ¶ 6.

## DISCUSSION

¶17  *Did the District Court err in denying Matt's motion for a directed verdict based on insufficient corroborating evidence?*

¶18  A defendant cannot be convicted on the testimony of an accomplice, unless the testimony is corroborated by other evidence that, in itself and without the aid of the accomplice, tends to connect the defendant with the commission of the offense. Section 46-16-213, MCA. "Given the motivations of such witnesses to avoid or ameliorate their own punishment, such testimony is inherently untrustworthy and cannot, without corroboration, sustain a conviction." *State v. Tollie*, 2022 MT 59, ¶ 14, 408 Mont. 129, 506 P.3d 1021.

¶19  To be sufficient, corroborating evidence must do more than merely describe the circumstances of the crime or raise suspicion of the defendant's involvement in the crime charged. *State v. Kemp*, 182 Mont. 383, 387, 597 P.2d 96, 99 (1979); *Tollie*, ¶ 15. The evidence must provide some independent connection between the crime and the defendant that is apparent without reference to the accomplice testimony. *Tollie*, ¶ 15. However, corroborating evidence does not need to extend to every fact the accomplice testifies to. *Tollie*, ¶ 15. Nor does corroborating evidence need to, by itself, support a defendant's conviction or a prima facie case against him. *State v. Black*, 2003 MT 376, ¶ 24, 319 Mont.

8

154, 82 P.3d 926. Corroborating evidence can be circumstantial, disputed, or even consistent with innocent conduct. *Black*, ¶ 24. Such evidence may also come from the defendant themselves, or any of their witnesses, as "it is up to the jury to resolve such factual questions." *Black*, ¶ 24.

¶20   In *State v. Rose*, 187 Mont. 74, 608 P.2d 1074 (1980), we held that a defendant's own admission to the possession of two guns stolen in a burglary sufficiently corroborated testimony of an accomplice in which the accomplice stated that the defendant had committed the burglary. *Rose*, 187 Mont. at 80-82, 608 P.2d at 1078-79. In that case, non-accomplice testimony established that the defendant was a disgruntled patient of the man who owned the burglarized property, and that the defendant was aware that the property owner was out of town at the time of the burglary. *Rose*, 187 Mont. at 76-77, 608 P.2d at 1076. The jury also heard non-accomplice testimony establishing that four of the stolen guns were found in the defendant's landlady's car, as well as testimony from the defendant himself, in which the defendant admitted to having possession of the guns at a point in time after the burglary and trying to "stash" them in a pasture. *Rose*, 187 Mont. at 78, 608 P.2d at 1076-77. Though this Court recognized that the only independent evidence connecting the defendant to the burglary was the defendant's admitted possession of the stolen guns, we held that evidence of his possession was sufficient as a matter of law to corroborate the accomplice's testimony. *Rose*, 187 Mont. at 81, 608 P.2d at 1078 (citing *State v. Williams*, 185 Mont. 140, 604 P.2d 1224 (1979) (holding that constructive possession of a stolen pistol sufficiently corroborated the testimony of an accomplice where the defendant was convicted of conspiracy to commit a burglary)).

¶21 However, in *Kemp*, we reversed a defendant's conviction for the sale of dangerous drugs, finding the conviction rested solely on accomplice testimony that lacked sufficient corroboration. *Kemp*, 182 Mont. at 388, 597 P.2d at 100. The accomplice in *Kemp* testified that she had purchased a large quantity of methamphetamine from the defendant, Kemp, at a Livingston hotel, and that she had also had other drug related dealings with Kemp in the past. *Kemp*, 182 Mont. at 384-86, 597 P.2d at 97-98. The accomplice further explained that because the transaction at issue was for such a significant amount, she received outside financing for the purchase. *Kemp*, 182 Mont. at 384, 597 P.2d at 97. According to the accomplice, one of the financers, a "Bill Knutson" of North Dakota, was to wire $600 to Kemp's bank account. *Kemp*, 182 Mont. at 384, 597 P.2d at 97. The accomplice went on to provide that after acquiring the drugs from Kemp, she gave the drugs to a friend in Three Forks for safe keeping. *Kemp*, 182 Mont. at 385, 597 P.2d at 98. It was during a search of the friend's home that the drugs became known to police. *Kemp*, 182 Mont. at 385, 597 P.2d at 98.

¶22 The non-accomplice testimony presented at Kemp's trial included testimony from the friend who admitted to taking possession of the drugs in Three Forks, as well as testimony from other individuals who had acquired drugs through the accomplice. *Kemp*, 182 Mont. at 388, 597 P.2d at 99. The jury also heard testimony from Kemp's banker who testified that Kemp had received a $600 wire transfer from a Knutson of North Dakota on the date in question. *Kemp*, 182 Mont. at 388, 597 P.2d at 99. Additionally, the State's case included an entry from the accomplice's ledger book stating, "B.J. will wire $600 to First Security Bank direct to you," which the Stated argued was a reference to Knutson's

10

transfer to Kemp. *Kemp*, 182 Mont. at 385, 597 P.2d at 98. The accomplice's address book was also found to contain the names of Kemp along with his banker, though the banker's name was spelled incorrectly. *Kemp*, 182 Mont. at 387, 597 P.2d at 99. It was also noted that the banker's name was misspelled on the wire transfer just as it had been in the address book. *Kemp*, 182 Mont. at 387, 597 P.2d at 99.

¶23 In considering the non-accomplice testimony presented in *Kemp*, we acknowledged the contemporaneousness of the wire transfer, but we also recognized that "[w]here the claimed corroboration shows no more than an opportunity to commit a crime and simply proves suspicion, it is not sufficient corroboration to justify a conviction upon the testimony of an accomplice." *Kemp*, 182 Mont. at 388, 597 P.2d at 99 (citation omitted). "The burden was on the prosecution to produce corroborating evidence which, of itself and without aid or direction from the accomplices' testimony, connected the defendant with the crime charged," and the prosecution failed to meet that burden. *Kemp*, 182 Mont. at 388, 597 P.2d at 99-100.

¶24 Setting aside the testimony of Gadaire, the State's case against Matt consisted of: testimony from Andrea Flores describing Gadaire's driving prior to the arrest; body cam footage and testimony from Buck describing the traffic stop and search; text messages and calls from Gadaire's phone, including those to and from "Matt and Ashley"; three packets of methamphetamine and drug paraphernalia recovered from the center console of Gadaire's vehicle; surveillance footage from the Three Forks Town Pump; and testimony from Reighard regarding his interview with Matt.

11

¶25 Here, the corroborating evidence is not sufficient to sustain Matt's conviction. Matt is not implicated by Flores's testimony or Gadaire's driving prior to the traffic stop, nor is he implicated by Gadaire's calls and texts to "Matt and Ashley." Like the defendant in *Kemp*, Matt is not connected to the crime charged through the independent dealings of his accomplice. Though Buck's testimony and body cam footage does place Matt in the passenger seat next to the center console where the drugs and drug paraphernalia were later found, this information merely creates a suspicion of Matt's potential involvement in the crime charged. And while the footage from the Town Pump places Matt in Gadaire's company in the time both immediately before and immediately after the alleged drug deal, its relevancy to the crime depends entirely on Gadaire's testimony. Absent Gadaire's testimony, the footage simply shows Gadaire parking his vehicle on the south side of the Town Pump lot with Matt in the passenger seat, then Gadaire exiting the vehicle and getting into the passenger side of the vehicle parked in the space immediately adjacent to the driver's side of his own vehicle. After several minutes, the video then shows Gadaire exiting that vehicle and returning to his own, where Matt appears to have remained. Without Gadaire's statements, we do not know who Gadaire met or what he was doing in the other vehicle. We do not see him carrying anything between the two vehicles. We do not see him put anything in the center console of his vehicle. The video places Matt in Gadaire's company prior to the traffic stop, but it ultimately fails to independently connect Matt to the drug evidence discovered.

¶26 The State points to Reighard's testimony and Matt's statements during the post arrest interview in which Matt admitted that he may have used the cash he earned from

12

Gadaire to buy drugs when he got home to Butte. However, Matt's potential to acquire drugs at some unknown time in the future does not connect him to the drugs found in the center console of Gadaire's vehicle. *See* §§ 45-9-102, 45-2-101(59), MCA; *see also In re R.L.H.*, 2005 MT 177, ¶ 18, 327 Mont. 520, 116 P.3d 791 (a person commits the offense of criminal possession of a dangerous drug when a person knowingly has dominion and control over a dangerous drug).

¶27 Absent Gadaire's testimony, the only independent evidence that has any tendency to link Matt to the crime is his mere presence in the vehicle at the time of the traffic stop. Though, unlike *Rose*, Matt does not admit to possessing the drugs or having any knowledge of the drugs being in existence. Rather, like *Kemp*, we find that the contemporaneousness of Matt's presence in the vehicle and the alleged drug deal "casts a cloud of suspicion over [Matt]," but "[w]here the claimed corroboration shows no more than an opportunity to commit a crime and simply proves suspicion, it is not sufficient corroboration to justify a conviction upon the testimony of an accomplice." *Kemp*, 182 Mont. at 388, 597 P.2d at 99. It was the State's burden to produce corroborating evidence to connect Matt to the crime charged, independent of the aid and direction of Gadaire's testimony. The State failed to meet its burden. The District Court erred in denying Matt's motion for directed verdict.

¶28 As resolution of this issue is dispositive, we need not address Matt's additional claim that the District Court erred in denying his motion to suppress.

**CONCLUSION**

¶29 The District Court erred in denying Matt's motion for a directed verdict at trial. A conviction that rests on the testimony of an accomplice cannot stand without sufficient

13

corroboration. Accordingly, Matt's conviction is reversed and remanded to the District Court to vacate the judgment and sentence, and dismiss the cause.

/S/ INGRID GUSTAFSON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER

Chief Justice Cory J. Swanson has recused himself and took no part in these proceedings.