No. 82-438

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

STATE OF MONTANA,

       Plaintiff and Respondent,

  -vs-

NOLAN T. DANIELS,

       Defendant and Appellant.

---

APPEAL FROM:  District Court of the Fifth Judicial District,
In and For the County of Beaverhead,
The Honorable Frank E. Blair, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Leaphart Law Firm; W. William Leaphart argued,
Helena, Montana
Schulz, Davis & Warren; John Warren argued,
Dillon, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
Patricia J. Schaeffer, Asst. Atty. General, Helena
W. G. Gilbert, III, County Attorney, Dillon, Montana

---

Submitted: January 9, 1984

Decided: May 15, 1984

Filed: MAY 15 1984

_Ethel M. Harrison_
--------------------------------------
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

We reverse for a new trial the judgment of conviction of Nolan T. Daniels for mitigated deliberate homicide following jury trial in Beaverhead County, Fifth Judicial District.

Nolan T. Daniels, a 43-year-old ranch hand, had lived in the Beaverhead County area for about ten years, until 1981, during which time he did ranch work and tended bar. Jimmy John Nolan, the victim in this case, was also a ranch hand and a resident of the Beaverhead County area at the time of the shooting. In previous years, Daniels and Jimmy John had crossed paths, sometimes to express indifferent or hostile feelings for one another. Their animosity was well known in the community.

In April 1981, Daniels moved to Cutbank, Montana, to work for William Rumney. There he injured his foot while shoeing horses, and taking time off he headed for St. Mary's to pick up a friend, Mike Smith. Daniels and Smith traveled south to the Dillon area in Daniels' Lincoln Continental. They spent June 5 and 6, 1981, barhopping in Dillon.

Our statement of what occurred on June 7 is basically a combination of what was described by Scott Tarver and Nolan Daniels. On Sunday, June 7, Daniels spent the morning looking for Mike Smith as they had become separated the evening before. Daniels met Scott Tarver, an acquaintance, in a downtown Dillon bar. The two decided to go to Dell for a roping event. Tarver, who had been drinking since early morning (his not unusual custom), bought a fifth of whiskey for the trip.

As they drove to Dell, Daniels and Tarver discussed Daniels' involvement in a fight which took place approximately six months earlier in Dell. According to Daniels, Tarver then asked Daniels if he had any guns, making some comment about his willingness to protect Daniels if the need arose. Daniels gave Tarver a .38 pistol which remained in the front seat of the car throughout the ensuing incident.

Once in Dell, the two stopped at the Airport Bar for a drink. They had stopped at the Dell Hotel but were refused admittance by the bartender, who obviously felt that because Jimmy John was inside, Daniels' presence would cause a disturbance. At the roping event, Daniels and Tarver met another acquaintance who agreed to meet them at the Airport Bar.

When Daniels and Tarver pulled into the parking lot of the Dell Airport Bar, Jimmy John Nolan was standing by the driver's side of his pickup truck. One witness testified that Jimmy John hollered something at Daniels as he drove in. Daniels testified that when he saw Jimmy John gesturing at him, he stopped his car. Jimmy John's pickup faced the bar and the Lincoln Continental was parked approximately 15 feet from the truck, angled from the rear of the passenger side of the truck. Tarver got out of the Lincoln, and walked to the wheel-well area of the truck on the passenger side. Daniels got out and approached Jimmy John. Daniels and Jimmy John became involved in a physical confrontation or wrestling match. At some point, Jimmy John reached for a pair of horseshoe nippers from the bed of his truck and struck Daniels on the head. The blow lacerated Daniels' scalp and cracked his skull causing him to bend over and turn away from Jimmy John. Daniels then walked back to his car, and after

- 3 -

getting his keys from the driver's side of his automobile, went to his trunk, and removed a .357 pistol. He walked back toward Jimmy John, brought the gun up and started shooting. He fired four shots as Jimmy John turned and fell dead. After handing the gun to Tarver, Daniels walked into the bar where, bleeding profusely, he waited for the ambulance and law enforcement officers.

Daniels claims that as he approached Jimmy John, Jimmy John grabbed him and tore a necklace which Daniels was wearing from his neck and that he was immediately struck by Jimmy John with the horseshoe nippers. Tarver's testimony was that the two wrestled for a few moments until, when Jimmy John got winded he pushed Daniels away, saying he had had enough. Tarver said that Daniels came back with an open pocket knife toward Jimmy John and that Jimmy John struck Daniels over the head then with the horseshoe nippers. The pocketknife was never found nor introduced into evidence.

We will bring out other facts where pertinent to the issues.

I.

The issue on which we reverse for a new trial is Greyson Phipps' testimony on rebuttal for the State. These statements were made by Daniels to Tarver just before they were getting out of the Lincoln automobile when they sighted Jimmy John outside the bar.

This case came on for trial on July 13, 1982. The first day was spent in picking the jury and in discussions between counsel before the court in chambers. On the second day, July 14, the State opened its case-in-chief. It called Tarver as a witness. When he got to the point in his testimony where he described leaving the automobile in which

- 4 -

he and Daniels came to the bar where they saw Jimmy John, he testified:

> "Q. Did you say anything to the Defendant when you saw Jimmy John? A. Yeah.
>
> "Q. What did you say? A. I said I'd buy him a beer. I wanted to talk to him, I'd buy him a beer.
>
> "Q. Now who did you say that to? A. Nolan. [Daniels]
>
> "Q. Did Nolan say anything to you? A. I don't know. Probably did. I might have said something to him back, but I don't really remember it, because I was half in the car and half out.
>
> "Q. How do you remember that this conversation took place? A. What do you mean, how do I remember it?
>
> "Q. How do you remember if Nolan said something to you and you said something to him. A. Cause I was half in the car and half out. I turned around and looked at Nolan and said something and he got out.
>
> "Q. Now what did the defendant do when you got out of the car. A. Who, Nolan?
>
> "Q. Yes. A. Well he was sitting in the car when I got out of the car."

When the examination and cross-examination of Tarver was completed Deputy Greyson Phipps took the stand. In no part of his examination was he asked whether Tarver had told him anything that Daniels may have said to Tarver as they were getting out of the car to meet Jimmy John.

Daniels' case-in-chief began the next day, July 15. The defendant Nolan T. Daniels testified on his own behalf and was cross-examined by the State. In no part of Daniels' examination or cross-examination was he asked whether he had made a statement to Tarver as they were getting out of the car upon seeing Jimmy John. The defense then called Deputy Greyson Phipps, who testified to an earlier threat that Jimmy John had made against Daniels and he was cross-examined on that subject. On the morning of July 16, the defense rested

and the State called Greyson Phipps as a rebuttal witness. The following occurred:

"Q. Now when you arrived at the Airport Bar, you saw Scott Tarver? A. Yes, sir.

"Q. And did you question him about what happened. A. Yes, I was trying to find out what had taken place.

"Q. Did he relate to you a conversation that he and the Defendant, Nolan Daniels, had just as he and Daniels were getting out of Daniels' car. A. Yes.

"Mr. Leaphart: Objection, Your Honor. It's calling for a hearsay.

"Mr. Gilbert III: Your Honor, it's offered--Tarver has testified that he remembers the conversation and he remembers Daniels saying something to him, he remembers getting out of the car with the door open, half out and saying something back. He's testified he told the Sheriff, but he said couldn't remember what was said.

"Mr. Leaphart: Your Honor, Mr. Tarver is the State's witness, and it can't be impeaching him, nor can they corroborate him on the rebuttal. And furthermore, Mr. Tarver's testimony, as I understood it, was that he couldn't remember what was said, if anything.

"Mr. Gilbert III: That establishes the foundation, Your Honor, we can impeach our own witness under the new rules.

"THE COURT: Objection is overruled.

"Q. What did Tarver tell you the Defendant said as he was about to get out of the car? A. Well, in my officer's report there that I wrote shortly afterwards, he stated that Mr. Daniels had said that had a score to settle and Mr. Tarver stated that he'd better be careful, the big Indian will whip your ass."

At the time that the rebuttal testimony was offered and admitted, Tarver had already been excused from the trial, defense counsel consenting to his excusal upon request of the county attorney. There is no testimony in the record as to what Tarver told the sheriff or that he could not remember what was said to the sheriff.

Daniels' defense during the trial was justification or self-defense. His testimony about the incident had indicated that he had gotten out of the automobile, went to Jimmy John, who grappled with him, tore off his necklace, and then struck him with the nippers. Daniels denied that he used any knife in the incident. In connection with his defense of self-defense, the issue of whether Daniels was an aggressor was, of course, important.

When Tarver first testified on July 14, during the trial, as part of the State's case-in-chief, he clearly made no statements that Daniels had said anything to him as they were getting out of the car to meet Jimmy John. Rather, he testified that he, Tarver, told Daniels, that Tarver would buy Jimmy John a beer. At that point of the trial, the State could clearly impeach him, or lay a foundation for later testimony by Greyson Phipps, by asking Tarver if he had not made such a statement to the deputy sheriff. Rule 607, M.R.Evid. This was not done. When Greyson Phipps came to the stand, immediately following Tarver's testimony, the State made no attempt then to elicit from Phipps what Tarver had told him, although the statement made to Phipps by Tarver would properly be a part of the State's case-in-chief. When the defendant was presenting his case, neither the defendant Daniels, nor the witness Phipps was asked anything about Daniels having made a statement to Tarver which would tend to characterize Daniels as an aggressor in the incident. Rebuttal testimony is proper only if it tends to counteract new matter offered by the adverse party. State v. Williams (1979), 185 Mont. 140, 153, 604 P.2d 1224, 1231; Gustafson v. Northern Pacific Railway Company (1960), 137 Mont. 154, 164, 351 P.2d 212, 217. Phipps' testimony was therefore improper

- 7 -

rebuttal testimony, but that was not the objection made to the District Court. Undoubtedly the court could allow in its discretion such rebuttal testimony. McGee v. Burlington Northern, Inc. (1977), 174 Mont. 466, 571 P.2d 784. The objection made by the defendant to Phipps' rebuttal testimony was that it was hearsay.

We must examine the testimony offered by Phipps to determine its nature. Phipps, on the stand, is testifying to what Tarver, following the shooting, told him that Daniels said prior to the shooting, as they were getting out of the car. This is hearsay within hearsay. Rule 805, M.R.Evid., provides that hearsay within hearsay is not excluded under the hearsay rule if each part of a combined statement conforms with an exception to the hearsay rule as provided in "these rules."

As a general rule, hearsay is not admissible:

"Rule 802. Hearsay rule. Hearsay is not admissible except as otherwise provided by statute, these rules, or other rules applicable in the courts of this state."

Hearsay is defined under Rule 801(c), M.R.Evid. as: ". . . a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

A "declarant" is defined as the person who makes the statement. Rule 801(b), M.R.Evid. Thus, in the case before us, as to the statement made to Phipps, Tarver is the declarant, and as to the statement purported to have been made to Tarver, Daniels is the declarant.

Irrespective of the broad definition of hearsay in Rule 801(c), M.R.Evid., above, a statement which otherwise fits

within this definition is not hearsay if it comes within one of the exceptions.

The exception relied upon in this case by the State for the admission of Phipps' testimony of Tarvers' statement is Rule 801(d)(1), M.R.Evid. That exception provides that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony . . ."

We have noted above that in Rule 805, hearsay included within hearsay is not excluded if each part of a combined statement conforms with an exception to the hearsay rule. If we regard the statement Tarver told the deputy that Daniels had told him "I've got a score to settle . . .", the declarant for that statement is Tarver. Under Rule 801(d)(1), the statement would not be hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement . . ."

In this case Tarver had been excused by the court as a witness in the cause on the evening prior to the offer of the rebuttal testimony by the State. He therefore was not subject to cross-examination concerning the statement. This is one of the requisites to form an exception to the hearsay rule for the admission of the Tarver's statement, since Tarver is the declarant. Admission of Phipps' testimony as to Tarver's statement was therefore improper. Since Tarver was not present for cross-examination, his statement was inadmissible because the exception does not apply. Rule 801(d)(1), M.R.Evid.

Because we determine that under the Montana Rules of Evidence the statement was not admissible in the

circumstances here, we need not decide whether the admission of Phipps' testimony amounted to a denial of Daniels' right to confrontation of witnesses against him, since plainly the absence of Tarver made his cross-examination impossible. The United States Supreme Court has not settled this point, sometimes holding that the admission of out-of-court statements violates a party's right to confrontation under the Sixth Amendment, and at other times holding that admission of such statements did not violate that amendment. See discussion in 11 Moore's Federal Practice § 800.02[2] (2d ed. 1976).

Having determined that error was committed in the admission of Phipps' testimony, we must then determine whether the error may have been harmless. That, of course, depends on whether the admission of the statement causes prejudice to the defendant. This Court must be able to state, in cases of error which we regard as harmless, that beyond a reasonable doubt the error did not affect the outcome of the trial. Chapman v. State of California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; State v. Sandstrom (1979), 184 Mont. 391, 603 P.2d 244. Daniels' self-defense position made it imperative that he establish that he was not the aggressor in bringing about the death of Jimmy John. Phipps' testimony if accepted at face value would make Daniels definitely an aggressor in stepping out of the automobile to meet Jimmy John. Effectively, his defense of self-defense was considerably weakened, if not destroyed by Phipps' testimony. Obviously the purpose of the offer of Phipps' testimony was to prove the truth of the matter asserted in the statement, that Daniels had a score to settle with Jimmy John.

On this ground, therefore, this cause must be reversed and remanded for a new trial.

## II.

Daniels argues he was denied a speedy trial here.

Jimmy John's death occurred on June 7, 1981. Daniels was jailed until the 37th day, July 14, when he was released on bail. He had been arraigned on June 30, 1981, after a delay in appearance by his retained counsel. On November 24, the 170th day from the date of the shooting, the court set trial for January 18, 1982. On January 12, 1982, the 219th day from the date of the shooting, defense counsel requested continuance of the trial because he was to undergo eye surgery. The court reset the trial for February 23, 1982. On February 26, 1982, the 265st day from the shooting, Daniels moved to dismiss for denial of a speedy trial. The motion was heard by the court on March 2, 1982, but meanwhile the trial was reset to March 22, 1982. On March 1, 1982, the 268th day from the day of the shooting, defense moved the court to depose Tarver, which had not been done before. The trial was reset to March 23, 1982.

After the deposition of Tarver was taken on March 2, 1982, it appeared that defense counsel might be required to testify for the purpose of impeaching Tarver based on prior statements he had made to them. The State moved to disqualify defense counsel on the grounds that they might be witnesses in the case. The court disqualified counsel on March 23, 1982. Eventually the court had to appoint further counsel for the defendant as an indigent on May 11, 1982. Then the trial setting was changed to July 6, 1982, and thereafter, by the District Court sua sponte, to July 13, 1982.

A total of 401 days elapsed between the day of the shooting and the date of the commencement of the trial. Daniels was not ready for trial as late as March 1, 1982, when it was necessary to take the deposition of the witness Tarver. Continuances had been requested by defense prior to that. Tarver's second motion for dismissal on speedy trial grounds was made on June 11, 1982 and was by the court denied.

In our opinion, the time lapse was largely attributable to Daniels, and insufficient time elapsed chargeable to the State to trigger the analysis required under Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101.

III.

Daniels raises issues in this case related to instructions which we must discuss for purposes of retrial.

Daniels was charged by the State with deliberate homicide. The jury convicted him of mitigated deliberate homicide, a lesser-included crime. Daniels had asserted the affirmative defense of justification or self-defense. It was necessary therefore for the District Court to guide the jury with instructions on deliberate homicide, section 45-5-102, MCA, mitigated deliberate homicide, section 45-5-103, MCA, and justifiable use of force, section 45-3-102, MCA. The court also instructed on negligent homicide, a further lesser-included crime.

Daniels asserts that the jury should have been instructed that the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse is an element of mitigated deliberate homicide that must be proved by the State; and that when self-defense is an affirmative defense, the State has a duty to prove beyond a

- 12 -

reasonable doubt the _absence_ _of_ _justification_ on the part of the defendant.

We held in the recent case State v. Gratzer (No. 83-157, Decided April 24, 1984), that the influence of extreme mental or emotional stress, contained in the definition of mitigated deliberate homicide in (section 45-5-103, MCA), is not an element of the crime which the State is required to prove beyond a reasonable doubt. We said:

> "It is the duty of the State in a criminal prosecution to prove beyond a reasonable doubt every element of the crime charged. Does this mean therefore that the influence of mental or emotional stress is an element that the State must prove in order to sustain a conviction of mitigated deliberate homicide as a lesser-included crime? We hold not. Under the statutory scheme defining homicide in the Montana Criminal Code of 1973, all purposely and knowingly committed homicides are deliberate unless committed under the influence of extreme mental or emotional stress. In defining the offense of mitigated deliberate homicide, the legislature did not create an additional element for the State to prove relating to mental or emotional stress. It simply stated the kind of mitigation that would reduce a deliberate homicide to a mitigated deliberate homicide. "

We further held that neither the State nor the defendant had the burden of proof as to mitigating circumstances, although either party may assume such burden, and that we would leave it to the jury to "examine the evidence and, if mitigating circumstances appeared in a killing purposely and knowingly committed by the defendant," the jury would then find the defendant guilty of mitigated deliberate homicide. _Gratzer_, supra.

This case, however, differs from _Gratzer_ in that here the defendant raised the affirmative defense of justification, according to sections 45-3-102, MCA and 46-15-301(2)(a), MCA. As an affirmative defense, justifiable use of force in defense of person under section 45-3-102,

- 13 -

would entitle Daniels to an acquittal, as distinguished from the result of influence of mental and emotional stress under section 45-5-103, which would simply reduce deliberate homicide to mitigated deliberate homicide. As to the affirmative defense of self-defense Daniels had the burden of proof.

How does the defense of justifiable use of force affect the duty of the State to prove beyond a reasonable doubt every element of the crime charged? Some uncertainty exists in the cases. In State v. Azure (1979), 181 Mont. 47, 54, 591 P.2d 1125, 1130, we stated that the jury <u>should</u> <u>be</u> <u>instructed</u> that the State must prove the absence of justification beyond a reasonable doubt, but sustained the refusal of an instruction to that effect because other instructions had covered the subject. Subsequently, in State v. Graves (Mont. 1981), 622 P.2d 203, 210, 38 St.Rep. 9, 15-16, we said:

> "This Court has been faced with numerous cases challenging self-defense instructions in recent years. As a result, Montana law in this regard has become well-settled. Section 45-3-102, MCA, defines 'justifiable use of force' and section 45-3-115, MCA, provides that it is an affirmative defense. Since it is an affirmative defense, rather than an element of deliberate homicide or mitigated deliberate homicide, there is no constitutional prohibition against placing the burden of proof upon the defendant. Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.E.2d 281. However, '[t]he law in Montana is that although the burden of persuasion remains on the State, in order to avail himself of the affirmative defense of self-defense, the <u>defendant</u> has the burden of producing sufficient evidence on the issues to raise a reasonable doubt of his guilt.'" (Citing cases) In State v. Azure (1979), Mont., 591 P.2d 1125, 1130, 36 St.Rep. 514, 518, we stated that an instruction stating the prosecution must prove the absence of justification beyond a reasonable doubt is a correct statement of the law." (Emphasis in original.)

In State v. Lundblade (Mont. 1981), 625 P.2d 545, 38 St.Rep. 441, we held that it is the duty of the State to prove each element of the offense charged. From these cases the true rule can be drawn: The State has the burden of proving beyond a reasonable doubt every element of the offense charged, or any lesser-included crime within such charge; the defendant if he raises an affirmative defense has the burden of producing sufficient evidence on the issue to raise a reasonable doubt of his guilt, in this case a reasonable doubt as to his guilt of deliberate homicide or of mitigated deliberate homicide.

We held in Gratzer that the absence of justifiable use of force was not an element of the crime of deliberate homicide which the State had to prove. The jury therefore should not be told that the prosecution must prove the absence of justification beyond a reasonable doubt. It is sufficient for these purposes if the trial court instructs the jury that the defendant has the burden of producing sufficient evidence on the issues to raise a reasonable doubt of his guilt when the defendant raises justifiable use of force as an affirmative defense. In this case, the District Court instructed the jury to that effect.

A further instructional error claimed by Daniels relates to the instructions on justifiable use of force. The District Court instructed the jury as to use of force in defense of person in accordance with the statute, section 45-3-102, MCA, and gave a further instruction outlining the necessity for reasonableness in the use of such justifiable force. However, he defined the word "imminent" which appears in section 45-3-102, MCA, as follows:

"'Imminent' means threatening to occur immediately, near at hand, impending; as used in relation to self-defense, it means such an appearance of threatening or impending injury as would put a reasonable and prudent man to his instant defense."

This instruction limited improperly the purpose and intent of the word "imminent" in section 45-3-102, MCA, which reads as follows:

"Use of force in defense of person. A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force . . ." (Emphasis added.)

In the quoted statute, section 45-3-102, MCA, the word "imminent" applies to the assailant, the aggressor; the person imminently threatened is entitled to use force against the aggressor "when and to the extent that he reasonably believes that such conduct is necessary." The effect of the instruction in this case defining "imminent" is that the person defending himself must act instantly. This is a limitation not to be found in the statute defining justifiable use of force. The threatened person is entitled to act "when and to the extent that he reasonably believes that such conduct is necessary." (Emphasis added.) This may or may not be instantly. It depends upon the reasonableness of the circumstances.

IV.

The District Court granted a motion in limine on behalf of the State and refused the admission into evidence of the sheriff's records of an earlier incident when Jimmy John, knowing or apparently knowing that Daniels was within hearing, allowed a gun to drop out of his pocket while Jimmy John was sitting at the bar and Jimmy John, in retrieving the

- 16 -

pistol, asked somebody nearby whether the pistol was big enough to kill Daniels. The incident was reported to the sheriff by Daniels. Statements were taken from witnesses. Eventually Daniels received a letter from the county attorney informing him that although Jimmy John did threaten to shoot Daniels, ". . . it is not apparent that he ever took any affirmative action in that direction."

The District Court allowed testimony in the record to the effect that the earlier incident had occurred and had been reported to the sheriff but refused any testimony respecting the outcome of the report, including the county attorney's letter. There was testimony that nothing further had been done by the county. Daniels claims that the sheriff's records and the letter would help establish Daniels' frame of mind in defending himself when the incident with Jimmy John occurred.

Technical errors in rulings of evidence are not grounds for reversal and in order to allow reversal the ruling must affect substantial rights. State v. Romero (1973), 161 Mont. 333, 505 P.2d 1207; Rule 103, M.R.Evid. We have stated repeatedly that the admission of evidence is a matter of discretion for the trial court which will not be disturbed, unless a manifest abuse of discretion is shown.

Since the testimony in this case included the earlier incident, Daniels' substantial rights were not affected by the refusal of the proffered evidence. Rule 103, M.R.Evid.

V.

Daniels objects to the deletion by the trial court of an offered instruction which contained a paragraph to the effect that the jury could consider the State's failure to call

witnesses or to produce other evidence shown in the case to be in existence and available.

Daniels bases his right to this paragraph in the instruction on the grounds that the State failed to produce the knife allegedly used in the incident; it failed to produce the .38 pistol allegedly given to Daniels by Tarver, and, it failed to produce the revolver which was in the front seat of the victim's truck at the time of the fight. The State also failed to produce Tarver as a rebuttal witness.

In civil cases at least, the jury is to be instructed on proper occasions that if weak or less satisfactory evidence is offered when it appears that stronger more satisfactory evidence is within the power of a party, the evidence offered should be viewed with distrust. Section 26-1-303(5), MCA. That, however, is not the portent of the offered instruction here. It went rather to how the jury should weigh and consider the evidence. We find no merit in this assignment of error.

VI.

Finally, Daniels contends that the imposition of an "enhanced" penalty under section 46-18-221(1), MCA, is a violation of the double jeopardy clauses of the federal and state constitutions.

Since this case is now being reversed for new trial, the enhancement of Daniels' sentence is moot. Note, however, that we settled this question in State v. Davison (Mont. 1980), 614 P.2d 489, 37 St.Rep. 1135.

VII.

Daniels' conviction of mitigated deliberate homicide is reversed and the cause remanded to the District Court for a new trial.

_____
                Justice

We concur:

_____
        Chief Justice

_____


_____


_____
            Justices

- 19 -

I concur and dissent as follows:

Although I agree that the trial court erred in permitting the testimony of Greyson Phipps, I disagree with the way the majority has handled this issue. If I correctly understand the majority position it is that Phipps' testimony was inadmissible because the declarant Tarver had been dismissed from the stand and was not present in the courtroom when Phipps testified. The majority quotes Rule 801(d)(1) M.R.Evid. which provides that a statement is not hearsay if the declarant testifies at the trial and the offered statement is inconsistent with his testimony. The purpose of this rule is to allow impeachment of any witness who testifies in the case.

If I understand the majority correctly they would have permitted this hearsay statement to be used if Tarver was seated out in the courtroom. This is not the law. The offered hearsay statement must be inconsistent with, and therefore impeach, testimony previously offered by the declarant.

I would reach the same result as the majority for the reason that this statement did not impeach Tarver's testimony. The closest testimony tending to be inconsistent with the offered hearsay is as follows:

"Q. Did Nolan say anything to you? A. I don't know. Probably did. I might have said something to him back, but I don't really remember it, because I was half in the car and half out."

To impeach this testimony given by Scott Tarver, the State called Greyson Phipps as a rebuttal witness. The following testimony was objected to as hearsay:

"Q. Did he relate to you a conversation that he and the Defendant, Nolan Daniels, had just as he and Daniels were getting out of Daniels' car. A. Yes.

"Q. What did Tarver tell you the Defendant said as he was about to get out of the car? A. Well, in my officer's report there that I wrote shortly afterwards, he stated that Mr. Daniels had said that had a score to settle and Mr. Tarver stated

20

that he'd better be careful, the big Indian will whip your ass."

The appropriate hearsay objection was made by defense counsel and the court overruled the objection. Before the Phipps testimony could be admitted that testimony had to directly contradict testimony offered by Tarver. Tarver was not asked about the statement. He admitted having a conversation when he was getting out of the car. However, Tarver's testimony is too general to allow this hearsay to be used for impeachment purposes.

It should also be noted that Phipps did not apparently have an independent recollection of what Tarver's statement was as Phipps read the statement from his notes. No foundation was laid for "past recollection recorded." Neither was foundation laid to show that the witness had an independent recollection of the statement after having his memory refreshed by reference to the notes. Although no objection was made on this ground the testimony was technically inadmissible as it was given by the witness.

The majority opinion, in discussing the instruction on justifiable use of force, uses language from which I wish to dissent. The majority opinion states:

"As to the affirmative defense of self defense Daniels had the burden of proof."

This is not so. The opinion correctly goes on to say that Daniels had the burden to come forward with evidence sufficient to raise a reasonable doubt. This is a correct statement of the law. Daniels had no burden of proof.

The majority opinion states:

"We held in Gratzer that the absence of justifiable use of force was not an element of the crime of deliberate homicide which the State had to prove."

Gratzer did not involve justifiable use of force. The only issue in Gratzer was whether the court erred in failing to instruct with respect to the burden of proof in a mitigated deliberate homicide case. Gratzer did not raise

self defense and therefore the appeal did not involve any issue with reference to "justifiable use of force".

I agree with the majority opinion that the trial court in this case correctly instructed the jury that the defendant had the burden of producing sufficient evidence on "justifiable use of force" so as to raise a reasonable doubt of his guilt. The corollary is that, once defendant had produced sufficient evidence to raise a reasonable doubt, the State had the burden of negating the defense beyond a reasonable doubt or the defendant is entitled to an acquittal.

In summary, I would reverse and remand for a new trial for the reason that the trial court erred in admitting hearsay evidence. In accordance with my dissent in Gratzer I would instruct the trial court that, on retrial, the defendant is entitled to an instruction that the burden of proof remains on the State to negate mitigation beyond a reasonable doubt. I would further require the trial court to give the same instruction with respect to the burden on the State to negate "justifiable use of force". Whether we are talking about mitigating mental distress or justifiable use of force, the burden is on the defendant to come forward with sufficient evidence to raise a reasonable doubt. Thereafter, the State has the burden of excluding these propositions beyond a reasonable doubt.

Justice

Mr. Justice Daniel J. Shea:
Concurrence
I join in the foregoing ~~dissent~~ of Mr. Justice Morrison.

Justice

22

Mr. Justice L. C. Gulbrandson dissenting.

I respectfully dissent from the holding of the majority opinion that the admission of Officer Phipps' rebuttal testimony constituted reversible error.

The majority opinion states:

> "Daniels' self-defense position made it imperative that he establish that he was not the aggressor in bringing about the death of Jimmy John. Phipps' testimony if accepted at face value would make Daniels definitely an aggressor in stepping out of the automobile to meet Jimmy John. Effectively, his defense of self-defense was considerably weakened, if not destroyed by Phipps' testimony."

The record, in summary, portrays a defendant looking for trouble. It is unrebutted that: (1) The defendant, anticipating problems, armed his companion, Scott Tarver, with a pistol. (2) That the defendant blocked the victim's vehicle with his own vehicle. (3) That the victim asked the defendant to get out of the way so that he could leave. (4) That after the altercation, next to the victim's pickup, the defendant walked to the driver's side of his car, attempted to reach his car keys through the open window, then opened the door and sat down on the front seat. (5) The defendant removed the car keys, walked to the rear of his car, approximately thirty-seven feet away from the victim. (6) The defendant opened the trunk of his car, obtained his Colt .357 from a box in the trunk, and walked directly back to the victim, firing four shots almost simultaneously. (7) That the victim had remained at the side of his pickup. (8) That the victim had nothing in his hands. (9) That one bullet hit the victim's left shoulder from the front; that another bullet entered the middle of the victim's back and

-23-

the injury would have been fatal within five minutes; that a third bullet entered the back and passed through the victim's heart. (10) That the shots to the victim's back were fired within a distance of one to four feet. (11) That none of the witnesses characterized the victim as the aggressor.

There was additional testimony, denied by the defendant, that (1) the victim had pushed the defendant away saying that he didn't want any more trouble with the defendant; (2) that the victim stated he wanted to be left alone; and (3) that, thereafter, the defendant, with a knife in his left hand, came back at the victim, prior to the time the victim hit the defendant with the horse shoe nippers.

In my view, the jury, even without the rebuttal testimony of Officer Phipps, would have had to disregard the defendant's claim of self-defense. I would, therefore, hold that the alleged error was harmless, and would affirm the conviction.

_____
Justice