No. 05-189

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 26

STATE OF MONTANA,

Plaintiff and Respondent,

v.

VINE MORRIS ARCHAMBAULT,

Defendant and Appellant.

APPEAL FROM: The District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 2002-0612,
Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Robert L. Kelleher, Jr., Attorney at Law, Billings, Montana

For Respondent:

Hon. Mike McGrath, Montana Attorney General, Joslyn M. Hunt,
Assistant Attorney General, Helena, Montana

Dennis Paxinos, Yellowstone County Attorney, Scott Twito,
Deputy County Attorney, Billings, Montana

Submitted on Briefs: June 28, 2006

Decided: February 6, 2007

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Following a jury trial in the District Court for the Thirteenth Judicial District, Yellowstone County, Vine Morris Archambault ("Archambault")[1] was convicted of two felony counts of assault with a weapon and one misdemeanor count of eluding a peace officer.  Archambault now appeals his two assault convictions.

¶2     The sole issue raised in this appeal is whether the District Court committed reversible error by refusing to give Archambault's proposed jury instruction regarding the issue of justifiable use of force.

¶3     We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     The two felony assault convictions at issue stem from Archambault's admitted act of firing a .22 caliber handgun toward Luella Roberts ("Roberts") and Billie Miller ("Miller").   Prior to this incident, Archambault testified, he had purchased methamphetamine from Roberts on a regular basis for over six months until a dispute arose from one of these transactions.  According to Archambault, Roberts provided him with an ounce of poor quality methamphetamine, which he refused to pay for, and she subsequently began to threaten and harass him, at one point calling him "a walking dead man."

¶5     On August 10, 2002, Archambault drove his minivan to Roberts' residence located at the end of Old Blue Creek Road, a gravel road which runs for roughly 1.5 miles along

---

[1]   The pre-sentence investigation report in this case states that Archambault is also known as Marlon Villagecenter.

the Yellowstone River south of River Front Park in Billings. At trial Archambault testified that he made this trip in order to inform Roberts that he was moving out of Billings "and just to see if there was anything I could do to patch things up." Archambault further testified that he brought along the two passengers in his van, Paul Underwood ("Underwood") and Amber White Bear ("White Bear"), in order to "have some kind of witnesses in case something happened." The group arrived at Roberts' residence at approximately 10:45 a.m., at which time Roberts and Miller were inside the home taking a break from their jobs at a nearby hotel.

¶6 Upon arrival, Archambault positioned his van closely behind Roberts' vehicle, a half-ton pickup truck, which was parked in front of the home's garage. Miller and Roberts then emerged from the house and entered the truck. Roberts demanded that Archambault move his van, which he did after she began to back up towards him. Archambault then drove away from the residence. Roberts claimed she followed him because Old Blue Creek Road is the only road leading from her residence back into Billings, and she and Miller needed to return to work at that time.

¶7 As to the subsequent events, trial testimony was inconsistent. Roberts testified that she collided with the rear end of Archambault's van after he slowed to a stop at a point where she could not drive around it. Roberts also testified that only one collision occurred and that she caused it intentionally because she was angry with Archambault and was late for work. As for the force of the impact, Roberts testified that it was "[n]ot real hard, just enough to, you know, kind of wake him up a little bit and tell him to get out of the way because he had stopped his van." Further, Roberts testified that

3

Archambault fired three shots toward her truck after the collision. She stated that he fired the first shot while sitting in the driver's seat of the van, and that he fired the next two shots while facing toward her with his upper body out of the driver's side window as the van was still proceeding along Old Blue Creek Road.

¶8 Archambault testified that Roberts collided with his van twice; that these collisions occurred while the van was moving forward; that the second collision occurred while he was driving at over forty miles per hour; and that the second collision was of such force that it caused him to temporarily lose control of the vehicle. As for his use of the gun, Archambault testified that he did not at any time shoot directly at Roberts or Miller. He testified:

> And then right after she hit me [the second time] I got [the van] back under control. . . . I held my arm out the window to let her see I was armed. . . . And she just kept coming. She didn't want to back off at all. She got in right behind me again real close. So at that time I didn't think she was taking me seriously so I aimed it in the air and fired off a shot.

Archambault further testified that after he fired this shot, Roberts "was still trying to come at me again, so at that point I leaned out the window, and I just figured my next move would be one [shot] above her head, so I pointed [the gun] in her direction." Additionally, Archambault stated that he had directed Underwood to take control of the steering wheel as he attempted to fire a second shot while leaning out the window. However, Archambault asserted, the gun misfired on this second attempt.

¶9 Miller, the passenger riding in Roberts' truck, corroborated Roberts' testimony that Archambault fired three shots. Underwood and White Bear, the passengers riding in Archambault's van, both testified that Archambault fired two shots. Miller, Underwood,

4

and White Bear all corroborated Roberts' testimony that the truck collided with the van only once.

¶10 After Archambault fired his gun toward Roberts and Miller, Roberts turned her truck around and proceeded back to her residence where she called 9-1-1 and reported Archambault's conduct. When law enforcement officers located Archambault shortly thereafter, he fled in his van briefly before surrendering.

¶11 The State charged Archambault with one misdemeanor count of eluding a peace officer, one felony count of assault with a weapon as to Roberts, and one felony count of assault with a weapon as to Miller. A three-day trial was held in April of 2003 and, as noted above, Archambault was convicted on all counts.

¶12 The District Court sentenced Archambault to a term of six months imprisonment pursuant to his conviction for eluding a peace officer, and two terms of twenty years imprisonment pursuant to his two convictions for assault with a weapon, with all terms to run concurrently. In doing so, the court noted Archambault's history of violent conduct, his involvement with the drug trade, his six prior felony convictions, and his nineteen prior misdemeanor convictions.

¶13 On appeal, Archambault seeks a new trial, claiming that the District Court erred in instructing the jury.

**STANDARD OF REVIEW**

¶14 In considering whether a district court has erred in instructing the jury, we determine whether the instructions, taken as a whole, fully and fairly instruct the jury regarding the applicable law. *State v. Courville*, 2002 MT 330, ¶ 15, 313 Mont. 218,

5

¶ 15, 61 P.3d 749, ¶ 15. If the district court has rendered instructions that are erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute a reversible error. *Courville*, ¶ 15.

## DISCUSSION

¶15 The defense theory of "justifiable use of force" is an affirmative defense. Section 45-3-115, MCA. The elements of this defense are delineated in § 45-3-102, MCA, which provides:

> **Use of force in defense of person.** A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another or to prevent the commission of a forcible felony.

The phrase "force likely to cause death or serious bodily harm" used in this statute includes, but is not limited to, "the firing of a firearm in the direction of a person, even though no purpose exists to kill or inflict serious bodily harm" and "the firing of a firearm at a vehicle in which a person is riding." Section 45-3-101(1), MCA. As we observed in *State v. Stone*, 266 Mont. 345, 347, 880 P.2d 1296, 1298 (1994), § 45-3-102, MCA, "allows a person to use force to defend himself or herself in a degree commensurate with the threat of harm the person faces."

¶16 At trial, Archambault relied on the "justifiable use of force" defense. Among other things, he testified that his van "would have rolled" had he not been able to regain control after Roberts intentionally "rammed" into it. He also testified that he believed

6

Roberts was going to hit his van a third time and he "realized that there was no way of getting away." Accordingly, Archambault stated, he acted out of fear when he used his gun to "defend" himself and his passengers. Further, defense counsel argued in closing that Archambault "believed [his use of the gun] was the only way that he could back [Roberts] off."

¶17 The District Court submitted two instructions to the jury regarding Archambault's defense theory. The first, Instruction No. 10, stated:

> **Justifiable Use of Force as a Defense**
> The defense of justifiable use of force is an affirmative defense and the defendant has the burden of producing sufficient evidence on the issue to raise a reasonable doubt of his guilt.
> If you find that he was justified in the use of force, you must find him not guilty on the assault counts.

The second, Instruction No. 11, was nearly a verbatim recitation of § 45-3-102, MCA. It stated:

> **Use of Force in Defense of a Person**
> A person is justified in the use of force or threat to use force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
> However, a person is justified in the use of force which is intended or likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm.

¶18 During the settling of instructions, Archambault's counsel argued that the language of the statute would be "less than clear to jurors" and should therefore be

7

restated as "an issue-type of instruction." Counsel proposed that the following instruction be submitted to the jury:[2]

> The defendant has pleaded justification in the use of force in this case. The defendant has the burden of producing sufficient evidence of justification in the use of force to raise a reasonable doubt of his guilt. You are to consider the following requirements of the law in determining whether the use of force claimed by defendant was justified:
> 1) The defendant must not be the aggressor;
> 2) The danger of harm to the defendant must be a present one[;]
> 3) The force threatened against the defendant must be unlawful;
> 4) The defendant must actually believe that the danger exists, that is, use of force by him is necessary to avert the danger and that the kind and amount of force which defendant uses is necessary;
> 5) The defendant's belief, in each of the aspects described, is reasonable even if it is mistaken.
> You are further advised that even if you determine the use of force by defendant was not justified, the state still has the duty to prove each of the elements of the crime charged beyond a reasonable doubt.

¶19 The District Court refused to give this instruction. In doing so, the court concluded that the language of given Instruction No. 11, which essentially recited § 45-3-102, MCA, was not confusing. Additionally, the court concluded that Archambault's proposed instruction was "inconsistent with the law." In explaining this conclusion, the court stated that the proposed instruction "would grant the defendant more leeway than he actually has under the law" because it "allows the defendant to act on his belief that he might be entitled to use deadly force against a threat that was less than deadly, and simply unlawful." Further, despite concluding that Archambault's

---

[2] Pursuant to *State v. Grimes*, 1999 MT 145, ¶¶ 37-39, 295 Mont. 22, ¶¶ 37-39, 982 P.2d 1037, ¶¶ 37-39, the proposal of this instruction adequately preserved Archambault's opportunity to argue the issue he has presented for review on appeal.

8

proposed instruction was "inconsistent with the law," the District Court also concluded, paradoxically, that the contents of that instruction were covered in Instructions No. 10 and 11 which the court had already decided to submit to the jury.

¶20 Archambault now argues that the District Court erred by refusing to submit his proposed instruction to the jury. In support of this argument, Archambault states that this instruction is a verbatim recitation of Montana Criminal Jury Instruction ("MCJI") No. 3-110, which this Court has explicitly approved. Further, Archambault contends that the given Instruction No. 11 did not fully and fairly instruct the jury because it merely recited the "abstract" language of § 45-3-102, MCA, rather than setting out a list of the elements of justifiable use of force. Therefore, Archambault contends, the omission of the five elements contained in his proposed instruction limited his ability to present a defense based on the theory of justifiable use of force. Upon these contentions, Archambault seeks a new trial with MCJI No. 3-110 to be submitted to the jury.

¶21 Archambault's proposed instruction was, in all consequential aspects, a verbatim recitation of MCJI No. 3-110. This instruction is based on language that Justice Sheehy proposed in his concurrence in *State v. Graves*, 191 Mont. 81, 96-97, 622 P.2d 203, 211-12 (1981).[3] Justice Sheehy reasoned that merely instructing a jury with the language of § 45-3-102, MCA, provides the jury with

---

[3] Our decision in *State v. Daniels*, 210 Mont. 1, 16, 682 P.2d 173, 181 (1984), overruled *Graves* in part on other grounds. We have stated: "Although not expressly holding so, *Daniels* overturned a line of case law, notably *State v. Graves* (1981), 191 Mont. 81, 622 P.2d 203, and *State v. Azure* (1979), 181 Mont. 47, 591 P.2d 1125, that had previously held that jury instructions stating that the State had the burden to prove an absence of justification [for the use of force] beyond a reasonable doubt were proper." *State ex rel. Kuntz v. Thirteenth Judicial District Court*, 2000 MT 22, ¶ 42, n.1, 298 Mont. 146, ¶ 42, n.1, 995 P.2d 951, ¶ 42, n.1.

an abstract statement which is of little use in its determinations. In cases where the use of justified force is claimed by the defendant, the jury, at least where the evidence supports it, should be given an instruction that sets out the elements which are to be considered in determining whether the force was justified.

*Graves*, 191 Mont. at 96, 622 P.2d at 211. Following this statement, Justice Sheehy listed five elements which he derived from § 45-3-102, MCA. *Graves*, 191 Mont. at 96, 622 P.2d at 211-12. Those elements, with minor revisions, are now contained in MCJI No. 3-110.

¶22 In *Stone* we held that MCJI No. 3-110, which we referred to as "the *Graves* instruction," supplements the "bare" language of § 45-3-102, MCA, and constitutes an accurate representation of the law of justifiable use of force. *Stone*, 266 Mont. at 348-50, 880 P.2d at 1298-99. Subsequently, in *State v. Claric*, 271 Mont. 141, 146, 894 P.2d 946, 949-50 (1995),[4] we noted this holding in *Stone* and reiterated that the *Graves* instruction constitutes an accurate statement of law. Therefore, the District Court erroneously concluded that Archambault's proposed instruction was inconsistent with the law.

¶23 However, while *Stone* holds that the *Graves* instruction accurately represents the law, *Stone* does not mandate that this particular formulation of the elements of justifiable use of force must be utilized when instructing a jury. Nor does *Stone* hold that the *Graves* instruction adds anything substantive to the statutory language which would be necessary to properly guide a jury. Indeed, this Court is not at liberty to introduce additional elements to the statute. Section 1-2-101, MCA (courts may not insert what has

---

[4] *Claric* has been overruled in part on other grounds in *Faulconbridge v. State*, 2006 MT 198, ¶ 53, 333 Mont. 186, ¶ 53, 142 P.3d 777, ¶ 53.

been omitted from statutes or omit what has been inserted). Rather, the recitation of elements contained in the *Graves* instruction simply constitutes a restatement of § 45-3-102, MCA.

¶24 Moreover, in *State v. White*, 202 Mont. 491, 498, 658 P.2d 1111, 1115 (1983), we held that the same basic language as was used in Instruction No. 11 in this case, which essentially recites § 45-3-102, MCA, "sets forth in full the requisite elements" of justifiable use of force "in a sufficient manner to guide the jury." Although *Stone* was decided subsequently, it did not overrule this holding in *White*. Thus, pursuant to *Stone* and *White*, both the *Graves* instruction and the language of § 45-3-102, MCA, provide adequate guidance to a jury regarding the elements of justifiable use of force. And, while the *Graves* instruction may arguably be more comprehensible for a jury, we have not required district courts to utilize it when instructing a jury regarding a defendant's claim that his or her use of force was justified.

¶25 As we have held, district courts are accorded broad discretion in formulating jury instructions. *State v. Hall*, 1999 MT 297, ¶ 39, 297 Mont. 111, ¶ 39, 991 P.2d 929, ¶ 39. This broad discretion is reflected in various rules we have developed over the years, including the following: (1) while district courts must instruct the jury on each theory which is supported by the record, the defendant is not entitled to have the jury instructed on every nuance of his or her theory of the case, *Claric*, 271 Mont. at 145, 894 P.2d at 949; (2) the fact that one instruction, standing alone, was not as complete or accurate as it could have been is not reversible error, *Stone*, 266 Mont. at 350, 880 P.2d at 1299; and (3) district courts may refuse to give a requested instruction if its contents are adequately

11

covered by the given instructions—i.e., it is not necessary to give repetitive instructions, *State v. DuBray*, 2003 MT 255, ¶ 92, 317 Mont. 377, ¶ 92, 77 P.3d 247, ¶ 92. Yet, while the district courts' discretion is broad, it is ultimately restricted by the overriding principle that jury instructions must fully and fairly instruct the jury regarding the applicable law. *Hall*, ¶ 39.

¶26 With this rule as our touchstone, we note that Archambault does not claim the given Instruction No. 11 was inaccurate in any way. In fact, he fails to address our decision in *White*. Instead, Archambault relies on Justice Sheehy's argument that the "abstract" language of § 45-3-102, MCA, should be fashioned into a list of elements in order to assist the jury in its determination. Archambault's argument is not without merit. Indeed, we have stated that "where our criminal code uses language which is not common to every day usage it becomes necessary to add explanation so the jurors will understand the law under which they are to decide the case." *State v. Campbell*, 160 Mont. 111, 114, 500 P.2d 801, 803 (1972).

¶27 However, to merely demonstrate that the *Graves* instruction might be more comprehensible to a jury than the statutory language, as Archambault attempts to do here, is to skirt the pertinent issue. Our task on review is not to determine whether the District Court chose the better of two legally proper instructions. Nor is our task to determine whether the court formulated the instructions in the best possible way. Rather, as noted above, we must simply consider whether the given instructions fully and fairly instructed the jury regarding the applicable law. *Courville*, ¶ 15.

¶28   In summary, *White* holds that the language of given Instruction No. 11 fully sets forth the requisite elements of justifiable use of force in a manner sufficient to guide the jury, and *Stone* did not overrule *White* despite approving the *Graves* instruction.  Further, Archambault has failed to demonstrate that our decision in *White* was erroneous. Accordingly, we conclude that the District Court did not err in instructing the jury because Instruction No. 11 fully and fairly set forth the applicable elements of Archambault's affirmative defense.

## CONCLUSION

¶29   Having concluded that the District Court did not err in instructing the jury, we affirm Archambault's two assault convictions.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM RICE

Justice James C. Nelson concurs.

¶30 For the most part, I concur in the Court's Opinion. While I believe that the *Graves* instruction better explains the "justifiable use of force" defense, I would not find reversible error in the trial court's discretionary refusal to give the instruction in this case. On the facts here, the other self-defense instructions that were given adequately instructed on Archambault's theory of defense.

¶31 That said, I suggest that it is a mistake not to provide the trial courts with some guidance as to when it is appropriate to give the *Graves* instruction and when it is not necessary. I suspect that there is, and will continue to be, a constant tension between accused persons—who will invariably want the instruction—and prosecutors—who will invariably not want the instruction. I also believe that trial courts are more inclined to give minimum instructional guidance to the jury, rather than more, with the result that the *Graves* instruction will remain on the books as good law, but, as here, with little practical import for the defense.

¶32 For example, it may be appropriate to require the *Graves* instruction in cases where there is a factual dispute over whether the accused or the victim was the aggressor, or where there is a factual dispute involving the imminence of the danger or threat against which the accused is defending himself or herself. Similarly, it may be appropriate to require the instruction where there is a factual dispute involving the accused's objective or subjective belief about the danger being defended against.

¶33 To be sure, the statutory (*White*) instruction and the *Graves* instruction do not contain identical information—i.e., where the giving of one would simply be cumulative

of the other. The *Graves* instruction actually provides the jury more information than does the *White* instruction and, in my view, better focuses the jury's attention on the elements of the defense. Certainly judges and lawyers are proficient at reading through a statute—e.g., the *White* instruction—and picking out elements or facts that need to be proven. Most lay jurors are not so adept, and, especially in complicated cases involving self-defense, it may be critical that the jurors be instructed in the more informative and "cook-book" fashion that the *Graves* instruction provides. In those cases, the *Graves* instruction should be required.

¶34 Given that we have not provided this guidance to the district courts, it will be up to defense counsel to not only offer the *Graves* instruction, but to also make an on-the-record showing of why the instruction is required, by reference to specific factual disputes necessitating the instruction. Only then will the accused have a reasonable chance of receiving the benefit of the instruction.

¶35 With that caveat, I concur.

/S/ JAMES C. NELSON