FILED

October 6 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0003

DA 14-0003

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 291N

STATE OF MONTANA,

        Plaintiff and Appellee,

    v.

CHAD SUN GOODGUN,

        Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADC 2012-358
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Wade Zolynski, Chief Appellate Defender, Chad R. Vanisko, Assistant Appellate Defender, Helena, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General, Pamela P. Collins, Assistant Attorney General, Helena, Montana

            Leo Gallagher, Lewis and Clark County Attorney, Jeff Sealey, Deputy County Attorney, Helena, Montana

Submitted on Briefs:  September 2, 2015
Decided:  October 6, 2015

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Chad Sun Goodgun (Goodgun) appeals his guilty verdict following a jury trial in the First Judicial District Court, Lewis and Clark County. Goodgun was convicted of misdemeanor partner or family member assault (PFMA), aggravated burglary, and tampering with witnesses. He was sentenced as a persistent felony offender and received concurrent sentences of 25 years to the Montana State Prison, with 15 years suspended, for aggravated burglary and tampering with witnesses; and 1 year to the Lewis and Clark Detention Center, all but 315 days suspended, for his PFMA conviction. We vacate and remand in part and affirm in part.

¶3 Goodgun and the victim, R.P., had been involved romantically from April until early November 2012, approximately seven months. They had broken up a few weeks before Thanksgiving. While they dated, Goodgun would sometimes stay over at R.P.'s apartment, but R.P. testified he did not live there.

¶4 On the night of November 21, 2012, R.P. and her brother returned from grocery shopping to find Goodgun sitting in R.P.'s car. Goodgun appeared agitated. After bringing in the groceries, R.P.'s brother had to return home but made sure R.P. was okay with being left alone with Goodgun. Once R.P.'s brother left R.P.'s apartment, however,

2

Goodgun and R.P. started arguing and R.P. asked him to leave. Instead of leaving, Goodgun emptied R.P.'s school work out of her backpack and began to fill it with some of her valuables, including her Kindle, a touchpad, gloves, and other items. When Goodgun moved towards the door to leave, R.P. attempted to grab her backpack from him. Goodgun turned around and knocked R.P. to the ground. He sat on top of her and hit her with his fists multiple times, causing injuries to her head, face, and ear. In one of his fists, he held a small flashlight as he hit her. When she tried to get up he pinned her down with his elbow on her throat and chest. He then ran out the back door. R.P. tried to pursue him but did not catch him. After returning to her apartment, R.P. took pictures of some of her injuries. A police investigator said the injuries she observed when she talked with R.P. a few days later were consistent with the injuries reported by R.P.

¶5    Four days later, on November 25, 2012, R.P. and Ryan Schafer, whom she had recently met, were in R.P.'s living room when Goodgun banged on the window and then used keys he had taken from R.P. to unlock her apartment. Ryan's five-year-old son and R.P.'s daughter were in the back room. R.P. tried to prevent Goodgun from turning the knob but Goodgun was nevertheless able to open the door. R.P. told Goodgun repeatedly to leave and asked for her keys back. Goodgun was angry and, referring to Ryan, yelled "Who is he?" Ryan was on probation and did not want to be involved in any conflicts so he asked to get his son from the back room and leave. After Ryan left, R.P. and Goodgun started arguing. Because she was afraid after the incident with Goodgun a few days prior, R.P. had placed a baseball bat on top of her cupboard so that it would be close at hand. Goodgun grabbed the bat. R.P. got close to him so that he could not swing the bat

3

and hit her with it. Goodgun then ran off and R.P. called the police. An officer responded and obtained a written statement from R.P.

¶6 Goodgun returned to R.P.'s home about an hour after police had left. He used R.P's keys once again to gain entry. R.P. was on the phone when Goodgun entered and Goodgun wanted to know who R.P. was talking with. R.P. buried her hand with the phone in the couch and Goodgun jumped over the armrest on top of her, trying to get the phone. He scratched her and bit her arm, elbow, and neck while he tried to force her to release the phone. Goodgun eventually succeeded in obtaining the phone and ran out of the house with it. R.P. tried to follow him to get the phone back but was barefoot and had to return to the apartment for shoes. When she went back outside, she saw a police officer and reported that Goodgun had returned.

¶7 Over the next few days Goodgun left messages for R.P. about not getting him in trouble for what he had done and about changing her story to get him out of trouble. Goodgun was arrested on November 29, 2012, on charges of assault with a weapon, aggravated burglary, and PFMA. The State also filed a persistent felony offender notice. Once in jail, Goodgun continued his appeals to R.P. On a jail phone line that gave notice it was recorded, Goodgun told R.P. that he was sorry for hitting her. He admitted that he had almost killed her. He told her that he wanted her to help him out of this mess that he had gotten himself into. Goodgun told R.P. that he could be out of jail as soon as January if she helped him. He told her to tell his lawyer that what actually took place was that R.P. thought Goodgun was cheating on her, that she did not want him to leave, and that when he went to leave the door hit her. Goodgun also told her to say that she had let him

4

into the apartment, rather than him entering uninvited, and that he was on the lease and did not break in. As a result of these calls, the State filed an additional charge of witness tampering.

¶8 One June 11, 2013, Goodgun filed a motion in limine arguing that admission of the recorded conversations between Goodgun and R.P. while he was in jail was overly prejudicial. The State opposed the motion arguing that Goodgun's incarceration established that he knew an impending investigation or official proceeding was pending or about to be initiated, which was an element of the tampering charge. After a hearing on June 24, 2013, the court allowed the prosecution to present that Goodgun's phone calls to R.P. were from the jail, but granted Goodgun's motion that references in the phone calls to Goodgun's prior bad acts, prior domestic violence, drug use, drug addiction, and drug-seeking behavior be excluded. The court noted that the State did not object to a limiting instruction to the jury, and the court stated, "[A]nd so I'll let the parties work on that."

¶9 Counsel for Goodgun did not offer such a limiting instruction at trial. Goodgun now argues that trial counsel's failure to submit a limiting instruction regarding evidence Goodgun was incarcerated constituted ineffective assistance of counsel. Claims for ineffective assistance of counsel (IAC) present mixed questions of law and fact that we review de novo. *State v. Miner*, 2012 MT 20, ¶ 10, 364 Mont. 1, 271 P.3d 56. We analyze such claims by applying the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). To prevail on an IAC claim, a defendant must establish (1) that counsel's performance fell below an objective standard

of reasonableness; and (2) that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. We need not address the prongs in any particular order nor address both prongs if a defendant fails to establish either prong. *Miner*, ¶ 11.

¶10 In addressing the merits of this claim, we begin with the second prong of the *Strickland* test. The jury considered the evidence of the photographs of R.P.'s injuries and R.P.'s testimony that Goodgun did not live with her, that he had keys to her apartment that did not belong to him, and that he was not authorized to enter her home on November 26, 2012. The jury also considered Goodgun's numerous admissions of guilt in the taped phone calls. They heard him tell R.P. that he was sorry for hitting her and that he had almost killed her. They heard him tell R.P. that he wanted her to help him get out of the mess he had gotten himself into and that he could be out of jail as soon as January if she helped him. They heard Goodgun telling R.P. to change her story and to tell his attorney that she did not want him to leave but was injured by the door when he did try to leave. The jury heard Goodgun tell R.P. to say that she had let him into the apartment, that he was on the lease, and that he did not break in.

¶11 Goodgun had been unsuccessful in his attempt to exclude the recordings in their entirety and the propriety of that decision is not before us. Instead, Goodgun argues that the jury should have been instructed that Goodgun's incarceration was not to be used except to the extent it established his knowledge of the impending investigation and charges. Based upon the substantial evidence of Goodgun's guilt that is in the record, we conclude that even if the jury had received a cautionary instruction regarding how to

6

consider Goodgun's incarceration, there is no reasonable probability that the result of the trial would have been different. Goodgun has therefore failed to meet his burden of demonstrating prejudice under *Strickland*.

¶12 Therefore, even if we assume that counsel's decision not to request a limiting jury instruction was error, we are convinced that there is no reasonable probability that the outcome of the trial would have been different given the slight beneficial effect of a limiting instruction and the substantial evidence present in the record of Goodgun's guilt. We are able to make this conclusion based on a review of the record without the necessity of "ask[ing] 'why' counsel did or did not perform as alleged and then seek to answer the question by reference to the record." *State v. Kougl,* 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095. *See also State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340. As the record establishes that there is no reasonable probability the result of the trial would have been different, but for counsel's failure to offer a limiting instruction, we find it unnecessary to delve into whether it was part of trial counsel's strategy to not accept the invitation by the court of requesting a limiting instruction. We determine the alleged IAC is record based and that the issue may be resolved on direct appeal.

¶13 Goodgun also argues on appeal that the District Court abused its discretion when it allowed Officer Ranalli's rebuttal testimony. Rebuttal testimony is proper only if it tends to refute a new matter brought out by the opposing party. *State v. Hart*, 2000 MT 332, ¶ 20, 303 Mont. 71, 15 P.3d 917 (citing *State v. Daniels*, 210 Mont. 1, 10, 682 P.2d 173 (1984)). District courts have wide discretion in determining the scope and extent of such

re-examination. *Hart*, ¶ 20. We review a district court's admission of rebuttal testimony for abuse of discretion. *State v. Redlich*, 2014 MT 55, ¶ 32, 374 Mont. 135, 321 P.3d 82.

¶14 Goodgun contends that the purpose of Ranalli's rebuttal testimony was to disprove Goodgun's assertion that he wished for R.P. "to tell the truth" regarding the charges against him. The State asserts that the testimony was needed to counter a new matter, that Goodgun lived with R.P., which had been raised by Goodgun's witnesses. The relevant cross-examination questioning follows:

> Q. [Defense Counsel, Ms. Eastman] Did you listen to all of the tapes?
> A. [Officer Ranalli] I listened to certain tracks from all of the disks, yes.
> Q. Do you recall Mr. Goodgun also telling [R.P.] to tell the truth?
> A. Yes, there are sometimes [sic] he said, "Tell the truth."
> Q. Tell the truth. Okay, but that's not on this tape, correct?
> A. No.
> Q. Do you recall him telling her to tell the truth about the flashlight?
> A. No, I just recall him saying, "You need to tell the truth." Nothing specific.
>
> MR. SEALEY [Prosecutor]: Your Honor, I'm going to object to this testimony and ask that you strike it on hearsay grounds. I have some questions about whether what is being asked of him is accurate.
>
> THE COURT: Let me look and see the question.
>
> Well, Ms. Eastman, the way I see it, if you have evidence on those tapes that's inconsistent with what Mr. Ranalli's testimony is, you are free to redact those somehow from the many hours of tapes and then play that.
>
> Ms. Eastman: Yes, Your Honor. I will move on. Thank you.

¶15 During rebuttal, Officer Ranalli testified that when Goodgun told R.P. to "tell the truth," it was in the context of Goodgun wanting to know who was in R.P.'s presence while she talked with him on the telephone, not in the context of her telling the truth about the charged offenses. The State objected to the line of questioning during cross-

8

examination. The District Court did not rule on the objection at the time. Given this apparent confusion at trial, we do not find it unreasonable or an abuse of discretion for the District Court to seek greater clarity on a potentially dispositive issue by allowing Officer Ranalli's rebuttal testimony.

¶16 Finally, Goodgun raises and the State concedes that counsel's failure to object to his conviction for PFMA as a lesser included offense constituted deficient performance and prejudice in this case.

¶17 Montana's multiple charges statute provides:

**MCA 46-11-410. Multiple charges**.
(1) When the same transaction may establish the commission of more than one offense, a person charged with the conduct may be prosecuted for each offense.
(2) A defendant may not, however, be convicted of more than one offense if:
(a) one offense is included in the other; . . . .

¶18 The State charged Goodgun with aggravated burglary including PFMA as a predicate offense and an element of the burglary crime. Goodgun was then convicted of both aggravated burglary and PFMA. Goodgun's convictions for both crimes are in violation of our statutory restriction on multiple convictions and must therefore be vacated on statutory grounds. Section 46-11-410(2)(a), MCA. Accordingly, we remand these proceedings to the District Court for the limited purpose of vacating the lesser included offense of PFMA, and for recalculation of conviction-based fees, costs, and fines.

¶19 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion

9

of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. Goodgun was not prejudiced by counsel's failure to request a cautionary jury instruction regarding his incarceration. The District Court's decision to allow Officer Ranalli's rebuttal testimony was not an abuse of discretion. Goodgun may not be convicted of PFMA when it serves as the predicate offense for aggravated burglary.

¶20 Affirmed in part; reversed and remanded in part.

/S/ LAURIE McKINNON

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT